**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-78 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Vehicle Safety & Compliance, LLC, | ) | |
| Pittco Capital Partners, L.P., | ) | |
| Pittco Capital Partners II, L.P., | ) | |
| Andrew Seamons, J.R. "Pitt" Hyde, | ) | |
| | ) | **Related Docket Nos.: 1 & 2** |
| Defendants. | ) | |
| _____ | ) | |

**OPPOSITION TO MOTION FOR PROTECTIVE ORDER TO QUASH THE**
**SUBPOENAS ISSUED TO MORGAN KEEGAN EMPLOYEE INVESTMENT FUND, LP**
**AND MORGAN KEEGAN EARLY STAGE FUND, LP**

In their motion to quash, Morgan Keegan Employee Investment Fund, LP and Morgan

Keegan Early Stage Fund, LP (collectively, the "Morgan Keegan Funds") contend that

DigaComm should be required to accept affidavits or written interrogatory responses in lieu of

depositions. But the Morgan Keegan Funds do not dispute that DigaComm is entitled to

discovery from them. The Morgan Keegan Funds also cannot dispute the relevance of this

discovery to DigaComm's claims in the underlying litigation, which concerns DigaComm's right

to compensation for facilitating a $4 billion transaction between a subsidiary of defendant

Vehicle Safety and Compliance, LLC ("VSAC") and General Electric. The Morgan Keegan

Funds are each investors in VSAC. Because the Morgan Keegan Funds possess information that

is both relevant and reasonably calculated to lead to the discovery of admissible evidence,

DigaComm must be allowed to depose them.

The Morgan Keegan Funds also claim that Delaware is not a proper location for the

depositions since the Funds allegedly have their principal place of business in Memphis,

Tennessee. It is unclear how DigaComm was expected to divine the Morgan Keegan Funds'

principal places of business, if they have one at all, given that the Funds have 79 and 82 partners,

respectively, who reside in 18 and 14 states, respectively. In the face of this uncertainty,

DigaComm elected to issue the deposition subpoenas out of the District of Delaware, where the

Morgan Keegan Funds are registered as limited partnerships. DigaComm's choice of forum is

also proper because the Morgan Keegan Funds waived any objections to the subpoenas,

including objections to the locations of the depositions, both through their course of conduct in

previously agreeing to the subpoenas and due to the lateness of their motion to quash. The

motion to quash should be denied.

## BACKGROUND

### I.       The underlying litigation

This discovery dispute arises out of litigation pending in the Northern District of Illinois

before the Honorable George W. Lindberg. In that litigation, DigaComm has brought claims for

fraud, unjust enrichment, and tortious interference with contract against each of the five

defendants relating to their role in denying DigaComm its agreed compensation for facilitating a

$4 billion deal between Vehicle IP, LLC (a wholly-owned subsidiary of Defendant VSAC) and

General Electric.

VSAC and its subsidiary, Vehicle IP, LLC ("VIP"), possess a portfolio of patents valued

at $4 billion. (*See* Am. Compl., ¶ 1.) (A copy of DigaComm's complaint is attached as Exhibit

A.) Believing they lacked the necessary capital and skill to successfully monetize the patent

portfolio, they approached DigaComm to seek its assistance in finding a monetization partner.

(*See id.* at ¶¶ 19-21.)

DigaComm was well-positioned to help VIP and VSAC. Indeed, DigaComm had

recently completed a deal with General Electric in which a GE special-purpose entity acquired a

2

portfolio of patents from a company called SightSound Technologies. (*See id.* at ¶ 22.) VIP and

VSAC were aware of the SightSound deal and were eager for a similar deal with GE. (*See id.* at

¶¶ 21, 27.) The parties connected and worked out an arrangement (the "March 9 Agreement") in

which DigaComm would facilitate a deal similar to SightSound in return for 5% of any

transaction. (*See id.* at ¶¶ 32-37.)

On the eve of a meeting between GE and VSAC's Preferred Holders, however, VSAC's

general counsel, J. Raymond Bilbao, repudiated the March 9 Agreement, informing DigaComm

that the "optics of the deal" had to change. Evidence developed during discovery indicates that

Pitt Hyde was the source of the directive to renegotiate the deal. Believing they had no choice in

the matter and that litigation might threaten the GE venture, DigaComm reluctantly agreed to a

reduction of its compensation, memorialized in a written fee schedule. (*See id.* at ¶ 39.)

As the parties reached agreement on this fee schedule, VIP and VSAC, for the first time,

demanded a provision that purported to condition DigaComm's compensation on approval by

VSAC's Preferred Holders. (*See id.* at ¶ 41.) DigaComm opposed this eleventh-hour addition,

but was assured by Mr. Larschan and Mr. Bilbao that the approval was a mere formality and a

foregone conclusion. (*See id.*) To demonstrate that approval would not be a problem, VSAC's

Mr. Bilbao solicited approval from Andrew Seamons, VIP's Chairman and the representative of

the Pittco defendants, VSAC Preferred Holders controlled by Pitt Hyde. (*See id.* at ¶¶ 8-11, 42.)

Mr. Bilbao received Mr. Seamons' approval and informed DigaComm the same day. (*See id.* at

¶ 42.) VIP/VSAC's management also promised to recommend approval to "the VSAC Preferred

Holders" and to do so "as soon as practicable." (*See id.* at ¶ 41.) Based on these representations,

DigaComm entered into a letter agreement with VIP on March 30, 2007. (*See id.* at ¶ 44.)

3

After March 30, DigaComm continued its efforts to advance the potential GE/VIP deal. Those efforts were successful: GE and VIP closed on a joint venture on August 16, 2007. (*See id.* at ¶ 2.) DigaComm, however, heard nothing from VIP until Mr. Larschan telephoned DigaComm Managing Member Peter Smith on September 6, 2007. (*See id.* at ¶ 57.) Mr. Larschan informed Mr. Smith that despite the fact that GE and VIP had successfully concluded a deal, the VSAC Preferred Holders had rejected DigaComm's compensation at a joint meeting of VSAC's Board and Preferred Holders on August 10, 2007. (*See id.*)

In response, DigaComm initiated the instant litigation, and asserted claims for tortious interference with contract, fraud, and unjust enrichment against Defendants. In its tortious interference counts, DigaComm claims that Defendants interfered with both the March 9 Agreement and the March 30 letter agreement by demanding that those agreements be repudiated. DigaComm's fraud claim alleges that Defendants or their agents made material misrepresentations of fact concerning the approval provision. For example, Defendant Andrew Seamons approved DigaComm's compensation, and his approval was communicated to DigaComm by VIP's and VSAC's General Counsel, Ray Bilbao. (March 30, 2007 email from Ray Bilbao, Ex. A at Ex. 3.) Four months later, however, Mr. Seamons voted against DigaComm's compensation — the same compensation he had previously approved. In its unjust enrichment count, DigaComm alleges that Defendants were unjustly enriched because they received the benefits of the GE Deal without compensating DigaComm for its efforts.

In addition to these theories of direct liability, DigaComm has also alleged that VSAC is liable for the actions of VIP, its subsidiary, on theories of alter ego and direct participation. DigaComm's alter ego theory is based in part on the almost complete overlap between VSAC and VIP. They operate as a single, unitary entity and share boards, management, and offices.

4

(Compl. at ¶ 74.) Indeed, through discovery, DigaComm has learned that even their operating agreements are essentially identical. DigaComm's direct participation theory provides that even if VSAC and VIP are not alter egos, VSAC should still be liable for VIP's actions because it exercised control over VIP for the purposes of this transaction that far exceeded the control normally exercised as an incident of ownership. (Compl. at ¶ 78.)

Defendants' sole defense to DigaComm's claims is the alleged failure of the condition precedent they contend was embodied in the approval provision discussed above. To that end, Defendants have alleged that the VSAC Preferred Holders had the "legal right" to vote against DigaComm's compensation after DigaComm had delivered the GE transaction they sought. VSAC alleges that both the recommendation and the votes occurred at the July 17 and August 10 meetings. VSAC also alleges that its management made the recommendation required by the March 30 letter agreement at those two meetings. The Morgan Keegan Funds are both VSAC Preferred Holders. DigaComm seeks to depose the Morgan Keegan Funds in order to understand, among other things why they have never heard of DigaComm and were never presented with management's recommendation that DigaComm's letter agreement be approved. DigaComm also seeks discovery from the Morgan Keegan Funds on the subjects of corporate governance and organization, the business history of VSAC, and the details of how the investor group was formed. These subjects all relate to a number of issues in the case, including DigaComm's alter ego and direct participation theories of liability, and are discoverable on that basis.

## II.     Procedural history

The litigation underlying this dispute is before Judge Lindberg in the Northern District of Illinois. Judge Lindberg runs a "rocket docket," in which the parties have only four months to complete discovery. Defendants have consistently sought to delay discovery in this case.

5

Indeed, DigaComm has already brought a motion to compel Defendants to produce documents in an effort to keep discovery moving apace. That motion was granted in part. Because of Defendants' tactics, just over two months of discovery remain, and yet DigaComm has not taken a single deposition.

Early in the discovery process, counsel for DigaComm requested that counsel for Defendants attempt to make contact with the third-party Preferred Holders such as the Morgan Keegan Funds and coordinate their voluntary participation in discovery. Counsel for Defendants declined to do so. DigaComm then began the more cumbersome and expensive process of issuing document and deposition to subpoenas to the VSAC Preferred Holders, including the Morgan Keegan Funds.

The deposition subpoenas at issue here were issued out of this Court on March 14, 2008. They were served on the Morgan Keegan Funds' registered agents in Delaware. The depositions were scheduled for April 1, 2008 at the offices of DigaComm's local counsel in Wilmington, Delaware. DigaComm also issued document subpoenas to the Morgan Keegan Funds out of this Court on February 27, 2008, and those subpoenas were served on the Funds' registered agent in Delaware on February 29, 2008. The document subpoenas were returnable on March 19, 2008.

On March 19, the day responses to the document subpoenas were due, John Lee, counsel for Defendants, contacted counsel for DigaComm to inform them that Mr. Lee's firm, Freeborn & Peters, would be representing the Morgan Keegan Funds. Mr. Lee requested a two-week extension to respond to the document subpoenas, and asked to reschedule the depositions set for April 1, 2008. DigaComm agreed to the two-week extension and to reschedule the depositions, but requested that new deposition dates be proposed soon. Counsel for the Morgan Keegan Funds agreed to get back promptly with alternative dates. No mention was made of any

6

objections. In an email of that same day, Mr. Lee wrote that "[w]e will get back to you shortly with alternative dates." (A copy of Mr. Lee's March 19, 2008 email is attached as Exhibit B.)

On March 20, after hearing nothing from counsel for the Morgan Keegan Funds on alternative deposition dates, counsel for DigaComm emailed Mr. Lee regarding dates. Counsel for DigaComm received no response until March 24, when counsel for the Morgan Keegan Funds wrote that they still did not have deposition dates for the Morgan Keegan Funds, but stated that "I will get back to you regarding the Morgan Keegan funds." (A copy of Ms. Fabian's March 24, 2008 email is attached as Exhibit C.)

After again hearing nothing on deposition dates, counsel for DigaComm sent another reminder to counsel for the Morgan Keegan Funds on March 25 and requested that the dates line up with other scheduled depositions. That same day, counsel for the Morgan Keegan Funds gave the impression that new dates would be proposed soon, informing counsel for DigaComm that "I am talking to Morgan Keegan tomorrow and will try to get a date at the same time for convenience." (A copy of Ms. Fabian's March 25, 2008 email is attached as Exhibit D.)

Thereafter, counsel for DigaComm heard nothing on the subject of deposition dates for the Morgan Keegan Funds until April 1, when counsel for the Funds offered, by letter, either an affidavit or written interrogatories in lieu of a deposition of the Morgan Keegan Funds. Ms. Fabian's letter concluded, however, by stating that "if you are not willing to take alternate steps in lieu of immediately scheduling the depositions, please let me know so that I may work to coordinate scheduling." (A copy of Ms. Fabian's April 1, 2008 letter is attached as Exhibit E.) The proffered alternatives to a deposition were unacceptable to DigaComm, and counsel for DigaComm informed so informed Ms. Fabian.

7

On April 8, notwithstanding weeks of delay premised on counsel's promise to provide

new dates, counsel for the Morgan Keegan Funds informed DigaComm that they would move to

quash the deposition subpoenas if DigaComm did not accept the proffered alternatives of an

affidavit or written interrogatories. This new position represented a radical departure from the

Morgan Keegan Funds' prior position. The proffered alternatives were unacceptable to

DigaComm, and the Morgan Keegan Funds filed their motion to quash on the next day.

## ARGUMENT

The scope of discovery is broad under the Federal Rules and requests for information

should be deemed relevant so long as there is any possibility that the information sought may be

relevant to the subject matter of the action. *See Breeze v. Royal Indem. Co.*, 202 F.R.D. 435, 436

(E.D. Pa. 2001) (information is relevant for the purposes of discovery if it "appears reasonably

calculated to lead to the discovery of admissible evidence"); *Goodyear Tire & Rubber Co. v.

Kirk's Tire & Auto Servicenter*, 211 F.R.D. 658, 663 (D. Kan. 2003) ("A request for discovery

should be allowed unless it is clear that the information sought can have no possible bearing on

the claim or defense of a party." (citation omitted)).

The broad definition of relevance for purposes of discovery extends to discovery of third

parties. *See Breeze*, 202 F.R.D. at 436; *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 541 fn. 2

(N.D. Ill. 2004) ("Rule 45 draws no distinction between parties and non-parties concerning the

scope of discovery.") Thus, "[a] party has a general right to compel any person to appear at a

deposition, through issuance of a subpoena if necessary." *CSC Holdings, Inc. v. Redisi*, 309 F.3d

988, 993 (7th Cir. 2002). Though a district court may quash a subpoena that subjects a third

party to an undue burden, it rests on the party seeking to quash the subpoena to demonstrate that

a burden is undue. *See Jones v. Hirschfeld*, 219 F.R.D. 71, 74-75 (S.D.N.Y. 2003). In order to

demonstrate undue burden, a third party must do more than simply state that he knows nothing about the case and that others know more. *See CSC Holdings, Inc.*, 309 F.3d at 993.

In *CSC Holdings*, the district court rejected a motion to compel a deposition on the ground that the deposition was not relevant. The district court based its decision on the "bare representation that [the deponent] knew nothing about the case" and that others knew as much as he did. *See id.* The Seventh Circuit reversed, holding (1) that the deponent's testimony was critically important, and (2) that the bare representation that the deponent lacked knowledge was "not enough to establish an undue burden under Rule 45 or to show some other exceptional circumstance that would justify prohibiting the deposition altogether." *Id.*

The Morgan Keegan Funds ask this Court to quash the deposition subpoenas on grounds almost identical to those at issue in *CSC Holdings*. Specifically, they claim to lack knowledge regarding DigaComm's claims, and claim that others know more than they do. But these allegations are insufficient to establish undue burden, particularly where, as here, the Morgan Keegan Funds possess information that is highly relevant to the claims and defenses at issue in this litigation. Moreover, as demonstrated above, the *absence* of knowledge on the part of VSAC Preferred Holders like the Morgan Keegan Funds is itself compelling evidence which undermines Defendants' positions. Because Movants have failed to demonstrate that the deposition subpoena subjects them to an undue burden, the motion to quash should be denied.

## I.   The Morgan Keegan Funds waived any objections to the subpoenas.

DigaComm believes that the motion to quash should be denied on its merits. However, a further justification for denial is the Morgan Keegan Funds' waiver of any objections to the subpoena. Under Rule 45, motions to quash must be brought in a timely fashion. "Timely" has been interpreted to mean no later than the noticed date of the deposition. *See Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237, 240 (S.D.N.Y. 2002) ("it is reasonable to assume that the

9

motion to quash should be brought before the noticed date of the scheduled deposition"). Here, the Morgan Keegan Funds did not assert any objections to the deposition until April 8, and did not move to quash until April 9. By raising objections for the first time and moving to quash more than a week after the date originally scheduled for the deposition, the Morgan Keegan Funds have waived any objections they may have based on burden or location.

In addition, the Morgan Keegan Funds waived their objections when they agreed through counsel to provide alternative deposition dates. Between March 19 and April 1, counsel for the Morgan Keegan Funds promised to obtain deposition dates on no fewer than four occasions. A string of promises to obtain deposition dates is inconsistent with a party's subsequent objection to the entire subpoena. Movants attempt to use the common professional courtesy regarding scheduling to gain tactical advantage.

The Morgan Keegan Funds' waiver has prejudiced DigaComm. DigaComm believes that a deposition of the Morgan Keegan Funds, both of which are Delaware limited partnerships, is proper in the District of Delaware. However, if DigaComm had been aware that the Morgan Keegan would object to the location, DigaComm could have, as an accommodation, issued new deposition subpoenas out of the Western District of Tennessee. But because the Morgan Keegan Funds sat on their objections, DigaComm did not take this step. If, for example, this Court found that the depositions are not proper in the District of Delaware, then DigaComm would be required to subpoena the Morgan Keegan Funds in the Western District of Tennessee. The Morgan Keegan Funds would presumably then assert many of the same objections they have asserted here and force DigaComm to litigate those objections before a different court. Delay tactics like these line up exactly with the tactics used by the Defendants to delay discovery in the

10

underlying litigation. The motion to quash should be denied and the depositions should be ordered to go forward in the District of Delaware.

## II.    The deposition subpoenas seek testimony that is highly relevant to DigaComm's claims.

The Morgan Keegan Funds contend that their lack of personal knowledge makes their depositions unduly burdensome. But the fact that the Morgan Keegan Funds apparently lack knowledge of DigaComm is precisely why DigaComm must take their depositions. The Morgan Keegan Funds are VSAC Preferred Holders, but they apparently never received a recommendation concerning DigaComm's compensation, even though VSAC's subsidiary was obligated to recommend approval to the VSAC Preferred Holders. (Ex. A at Ex. 1, p.2.) The Morgan Keegan Funds apparently also never voted on DigaComm's compensation. These subjects are directly relevant to the principal defense mounted by the Defendants in this case. DigaComm is also entitled to inquire after subjects relating to VSAC's corporate governance, the GE Deal, and the value of the patents at issues. As Preferred Holders in the entity that now claims it had the right to bar its subsidiary from complying with its agreements, the Morgan Keegan Funds are an important source of discovery. The absence of knowledge regarding certain facts is a compelling basis for the depositions, not a reason to quash them.

As an alternative to depositions, the Morgan Keegan Funds have offered to provide affidavits or responses to written interrogatories concerning their lack of personal knowledge. But DigaComm is not required to accept counsel's offer of an affidavit or responses to written interrogatories. By offering these alternatives, the Morgan Keegan Funds admit that DigaComm is entitled to the discovery, but they seek to dictate the way in which that discovery is obtained. The Morgan Keegan Funds' proffered alternatives are, however, unacceptable to DigaComm. In particular, the Morgan Keegan Funds fail to establish that these alternatives would be admissible

11

in the Northern District of Illinois. They also do not address the practical dilemma regarding how DigaComm could possibly draft affidavits for witnesses it has never met and about whom it knows little. In short, DigaComm's subpoena to the Morgan Keegan Funds is appropriate under Rules 26 and 45. The motion to quash should be denied.

### III.    Depositions are proper in Delaware because the Morgan Keegan Funds are Delaware Limited Partnerships.

While the general rule is that the deposition of a corporation should generally take place at the corporation's principal place of business, "the rule is not inflexible and is subject to modification." *Bro-Tech Corp. v. Thermax, Inc.*, Civil Action No. 05-2330, 2006 WL 3337496, at *2 (E.D. Pa. Nov. 16, 2006). Indeed, the Court retains considerable discretion to determine the location of a deposition. *See Triple Crown America, Inc. v. Biosynth AG*, No. CIV.A. 96-7476, 1998 WL 227886, at *3 (E.D. Pa. April 30, 1998). The Court should exercise its discretion to require the depositions to take place in Delaware for three reasons. *First*, the Morgan Keegan Funds are Delaware limited partnerships. Though the Morgan Keegan Funds undoubtedly formed in Delaware to take advantage of this state's expertise in the law of business organizations, this choice is not without costs. The Morgan Keegan Funds should not, therefore, be allowed to invoke the protections of Delaware law, only to protest when their choice imposes corresponding obligations.

*Second*, the Morgan Keegan Funds assert that their principal places of business are located in Memphis, Tennessee, but fail to explain why DigaComm should be required to divine this information. Nor did the Morgan Keegan Funds provide any evidence to support their assertion that their principal places of business are located in Memphis, Tennessee. The Morgan Keegan Funds are both Delaware limited partnerships, but their partners are spread throughout the country. Morgan Keegan Employee Investment fund has 82 individual partners, and those

12

partners reside in Alabama, Arkansas, California, Colorado, Florida, Georgia, Kentucky, Louisiana, North Carolina, New York, Rhode Island, Tennessee, Texas, and Virginia. Morgan Keegan Early Stage Fund's 79 partners are even more widely scattered, residing in Arkansas, Arizona, California, Connecticut, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, New York, South Carolina, Tennessee, Wisconsin, West Virginia, and South Africa. As far as DigaComm knows, the Morgan Keegan Funds' principal places of business could be in any of these states and foreign countries.

In the face of considerable uncertainty, DigaComm issued the deposition subpoenas out of this Court because the Morgan Keegan Funds were formed and registered as limited partnerships in Delaware and maintain registered agents there to accept service of process.[1] It should also be noted that the Morgan Keegan Funds, on whom the burden falls to demonstrate that the subpoenas at issue should be quashed, have not supported their assertion that their principal places of business are in Memphis, Tennessee with affidavits or any other form of evidence. Thus, the Court has no basis to determine, on this record, where the Morgan Keegan Funds' principal places of business are located.

*Third*, as discussed above, the Morgan Keegan Funds waived any objections to the deposition taking place in Delaware by failing to object within a reasonable time and by leading counsel for DigaComm to believe, for nearly three weeks, that deposition dates would be forthcoming. Moreover, on April 2, the Morgan Keegan Funds responded to document subpoenas issued out of this Court. At no time prior to serving their responses did the Morgan

---

[1]    Under the Morgan Keegan Funds' theory, the only way that DigaComm could actually find out where the Funds' principal places or business or representative deponents were located would be to issue a subpoena from Delaware and await a motion to quash identifying the appropriate district. DigaComm would then issue a subpoena from that district. After all, DigaComm cannot be expected to know the principal place of business or the location of an unspecified corporate representative of a limited partnership with partners in multiple states. The more obvious approach is that a Delaware limited partnership should well know when it forms itself in Delaware that a Rule 30(b)(6) deposition may take place there.

Keegan Funds object to the subpoenas on the grounds that they were issued out of an improper

court. Having accepted this Court's jurisdiction with respect to the document productions, the

Morgan Keegan Funds cannot walk away from that choice when it comes time for them to be

deposed. For these reasons, the Morgan Keegan Funds are properly subject to deposition in

Delaware, and the motion to quash should be denied.

### CONCLUSION

DigaComm respectfully requests that the Court (1) deny the motion to quash; (2) order

representatives of the Morgan Keegan Funds to appear for deposition within 10 days; and (3)

grant all other necessary and proper relief.

Dated: April 17, 2008

PACHUSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P. O. Box 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302)-652-4400

and

KIRKLAND & ELLIS LLP
Reed S. Oslan, P.c.
Stephen C. Hackney
Matthew E. Nirider
200 East Randolph Drive
Chicago, Ilinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Attorneys for DigaComm, LLC.

14

# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
LAW DIVISION

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2007L013795 |
| v. | ) | |
| | ) | |
| Vehicle Safety and Compliance, LLC, | ) | Hon. Daniel J. Kelley |
| Pittco Capital Partners, LP, | ) | |
| Pittco Capital Partners II, LP, | ) | |
| J.R. "Pitt" Hyde III, and Andrew Seamons, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

FILED
Law Div.-2304

DEC 1 3 2007

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**FIRST AMENDED COMPLAINT FOR FRAUD,
TORTIOUS INTERFERENCE, AND UNJUST ENRICHMENT**

In support of its Complaint, DigaComm, LLC ("DigaComm") states as follows:

1.      Through this complaint, DigaComm seeks compensation it is due for introducing

Vehicle IP, LLC ("VIP"), a wholly-owned subsidiary of Vehicle Safety and Compliance, LLC

("VSAC"), to General Electric ("GE") and facilitating a deal in which GE would partner with

VIP and VSAC to monetize a portfolio of valuable patents.  The patents in question are valued at

$4 billion dollars.

2.      After the parties negotiated an agreement to compensate DigaComm with a

portion of the proceeds generated by the GE joint venture, DigaComm went to work.  Its efforts

for the benefit of VIP and VSAC quickly bore fruit.  On August 16, 2007, GE and VIP/VSAC

closed on their joint venture agreement.

3.      Apparently not content with the billions they stood to make from the GE joint

venture, VSAC and its Preferred Holders caused VIP to renege on its agreement to compensate

DigaComm. On September 7, 2007, VIP Chief Executive Officer Brad Larschan informed

DigaComm's Managing Member Peter Smith that DigaComm would be paid nothing for

procuring the GE joint venture.

      4.      DigaComm brings this action against VSAC, Pittco Capital Partners, LP, Pittco

Capital Partners II, LP, J.R. "Pitt" Hyde III, and Andrew Seamons.

## PARTIES

      5.      Plaintiff DigaComm is a Delaware limited liability company headquartered in

Chicago, Illinois. Its address is 400 North Michigan Avenue, Suite 520, Chicago, Illinois,

60611. DigaComm was founded in 1997 and is a Chicago private investment firm specializing

in early stage venture capital rounds. DigaComm's managing members are Peter Smith and

Robert Spillane.

      6.      Defendant VSAC is a Delaware limited liability company headquartered in

Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee,

38117. VSAC is the sole member of VIP, and thus, the sole owner of VIP.

      7.      Related Party VIP is a Delaware limited liability company headquartered in

Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee,

38117. VSAC is VIP's sole member. VIP is not a named defendant in this complaint because

DigaComm's dispute with VIP is subject to an arbitration clause. DigaComm has initiated

arbitration proceedings against VIP, and those proceedings are ongoing.

      8.      Defendant J.R. "Pitt" Hyde III is a resident of Tennessee. His address is 6058

Shady Grove Road, Memphis, Tennessee, 38103. Mr. Hyde is a prominent Memphis

businessman and is the founder of the AutoZone chain of auto parts stores. Upon information

and belief, Mr. Hyde is one of the partners of Pittco Capital Partners, LP and Pittco Capital

Partners II, LP.

9.      Defendant Pittco Capital Partners, LP is a Tennessee limited partnership with its

principal place of business at 6075 Poplar Avenue, Suite 335, Memphis, Tennessee, 38119.

Pittco Capital Partners, LP is a Preferred Holder of VSAC.

10.     Defendant Pittco Capital Partners II, LP is a Tennessee limited partnership with

its principal place of business at 17 W. Pontotoc, Suite 200, Memphis, Tennessee, 38103. Pittco

Capital Partners II, LP is a Preferred Holder of VSAC.

11.     Defendant Andrew Seamons is a resident of Tennessee. His address is 2910

Garden Lane, Memphis, Tennessee, 38111. Upon information and belief, Mr. Seamons is one of

the partners of Pittco Capital Partners, LP and Pittco Capital Partners II, LP. Upon information

and belief, Mr. Seamons is J.R. "Pitt" Hyde III's agent. Mr. Seamons is also Chairman of the

Board of VIP.

## JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over the defendants because they,

individually and through agents, transacted business in Illinois by engaging DigaComm, a

limited liability company headquartered in Chicago, Illinois, to introduce VIP to John Hall, then

a GE executive based in Chicago, Illinois. The introduction and at least two other meetings took

place in Chicago, Illinois. In addition, the harm caused to DigaComm by the defendants

occurred in Illinois.

3

13.     This complaint arises out of the defendants' and their agents' transaction of business in Chicago, Illinois.

14.     The exercise of jurisdiction over the defendants in this case is consistent with the requirements of due process.

15.     Venue is proper because all of the portions of the transaction that occurred in Illinois occurred in Cook County. Venue is further proper because all of the defendants are nonresidents of Illinois.

## STATEMENT OF FACTS

16.     VSAC and VIP are patent "trolls" — entities whose principal assets are intellectual property but which do not otherwise operate active businesses. The patents at the center of this lawsuit involve motor vehicle communication technology. VIP and VSAC value these patents at $4 billion.

17.     The patents in question were acquired during the bankruptcy of then-holder Remote Dynamics, Inc. in 2004. Raymond Bilbao, formerly General Counsel to Remote Dynamics, Inc., followed the patents to VIP and now serves as VSAC's General Counsel.

18.     The capital used to acquire the patents and develop them was provided to VIP by VSAC, its sole member. VSAC is believed to have invested approximately $5 million in capital, by way of loans or capital contributions.

19.     After acquiring the patents, VIP set about its efforts to monetize those patents. The principal method for a patent troll to monetize intellectual property is to sue patent infringers

4

for damages. Alternatively, a patent troll can monetize a patent by entering into licensing agreements with businesses interested in utilizing the technology.

20.    In 2006, VIP entered into discussions regarding its patent portfolio with the Boston intellectual property firm Fish & Richardson. Under the proposals, Fish & Richardson agreed to invest between 30 and 100% of its fee in return for participation in any damages or licensing fees received through its suits against infringers of certain patents.

21.    In December 2006, an attorney at Fish & Richardson named Michael Bunis contacted DigaComm Principal Jonathan Tunick and encouraged DigaComm to investigate the VIP portfolio. Mr. Bunis was aware of DigaComm's work on a previous transaction between SightSound Technologies, Inc. ("SightSound") and GE and believed that DigaComm was well-positioned to assist VIP to achieve a similar venture with GE.

22.    DigaComm was, indeed, well-positioned to assist VIP. In July 2005, it had entered into an agreement with SightSound under which it had agreed to assist SightSound to form a joint venture with General Electric. The SightSound/GE joint venture was structured as follows: (a) SightSound would contribute its patents to a special purpose entity; and (b) GE would contribute necessary capital and would use its experience and sophistication to monetize the patents, either by negotiating license agreements or by enforcing SightSound's patents against infringers.

23.    In return for facilitating the SightSound/GE joint venture, DigaComm was to receive 5% of any amounts generated by the joint venture after certain amounts (such as GE's capital investment) were repaid.

5

24.     The SightSound/GE joint venture closed successfully in mid-2005. Though the patents in that matter are currently under re-examination by the Patent and Trademark Office, DigaComm will receive the 5% owed to it for facilitating the transaction once the patents emerge from the re-examination process.

25.     Aware of DigaComm's experience and success on the SightSound transaction, Fish & Richardson's Mr. Bunis contacted Jonathan Tunick of DigaComm and suggested that DigaComm talk to Bradley Larschan, VIP's CEO.

26.     In January 2007, Mr. Tunick contacted Mr. Larschan in order to explore the possibility of facilitating a joint venture between VIP and GE. Mr. Larschan had been waiting for Mr. Tunick's call and was receptive to the idea. Upon information and belief, VSAC and its Preferred Holders authorized and/or approved all actions taken by VIP in connection with its communications with DigaComm.

27.     Mr. Larschan eagerly embraced the idea of a joint venture with GE because GE was a market participant in the very fields encompassed by the VIP patents. Because of GE's status as a market participant, Mr. Larschan believed that GE had a stronger legal footing for enforcing the patents and that GE could do so without being perceived as a patent troll. In fact, Mr. Larschan had previously authored an article in which he explained how a recent intellectual property decision by the United States Supreme Court made a market participant like GE a valuable, if not indispensable, ally in enforcing patents. (A copy of Mr. Larschan's article is attached as Exhibit 1.)

28.     On February 6, DigaComm hosted Mr. Larschan and Mr. Bilbao at its offices in Chicago. During this meeting, DigaComm again raised the idea of working with VIP to secure

6

an agreement with GE similar to the SightSound transaction. Mr. Larschan reiterated his interest in the idea. The next day, Mr. Larschan called from the airport and told Mr. Tunick that VIP "really liked" the idea of pursuing a deal with GE and inquired about the next steps. Mr. Tunick promised to coordinate with John Hall of GE, the executive involved in the SightSound transaction.

29.     On February 13, 2007, Mr. Larschan emailed to Mr. Hall of GE a set of financial projections for each of VIP's three intellectual property groups. Acknowledging DigaComm's role as the facilitator of the transaction, on February 16, 2007, Mr. Larschan asked whether Mr. Tunick would follow up with General Electric. Mr. Tunick agreed to do so the same day.

30.     On February 17, 2007, Mr. Larschan thanked Mr. Tunick for his continued efforts with respect to GE and requested a copy of the SightSound transaction so that he could "advocate for it" with VSAC and the VSAC Preferred Holders. DigaComm complied with Mr. Larschan's request.

31.     On February 27, 2007, Mr. Larschan again thanked Mr. Smith and Mr. Tunick for "pushing along the GE deal," noting that it "could be a great opportunity."

32.     On March 7, Mr. Tunick and Mr. Larschan spoke by telephone regarding DigaComm's compensation. By this time, DigaComm had scheduled a meeting with John Hall of GE that was to take place the following day in Chicago. Mr. Tunick said that DigaComm was looking for a 10% piece of any transaction in return for bringing the transaction to VIP's attention. Mr. Tunick emphasized that if VIP and DigaComm were not able to agree on DigaComm's compensation, the March 8 meeting with GE would be cancelled.

7

33.     Mr. Larschan pushed back. He said that 10% was not acceptable to VIP or

VSAC, but that 5% was "not a problem" and was the "market rate." Mr. Tunick agreed that

DigaComm would accept 5%.

34.     On March 8, 2007, John Hall of General Electric met with Mr. Larschan and

others of VIP and made a power-point presentation reflecting GE's view of how best to monetize

the patents in question.

35.     At the conclusion of the meeting, Mr. Hall asked what VIP wanted from GE. Mr.

Larschan said "we want what you did on the SightSound deal." The meeting ended on a positive

note. Mr. Hall agreed to speak with Todd Dickinson, GE's head of intellectual property.

36.     On March 9, Mr. Tunick emailed Mr. Larschan to report on a conversation he had

had with John Hall of GE. In his email, he noted the parties agreement with respect to

DigaComm's 5% compensation:

> Brad — I will report to you on John Hall's conversation with Todd Dickenson,
> but before doing so I want to ensure that we have agreement on our own working
> arrangement. As you and I agreed prior to our meeting, the waterfall splits will be
> 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming
> our prior understanding.

37.     Eager to learn of the new development and keep the deal on track, Mr. Larschan

confirmed Mr. Tunick's understanding of the parties' agreement as to DigaComm's

compensation:

> Jonathan, This represents our understanding of the percentage split. I look
> forward to hearing about John's conversation with Todd.

(A copy of this email chain is attached as Exhibit 2.)

38.    With the GE deal progressing smoothly and with VIP having established direct contacts with GE, VSAC apparently felt free to interfere with VIP's March 9, 2007 promise to pay DigaComm 5%. On March 29, 2007, VSAC's Mr. Bilbao informed Mr. Tunick during a telephone call that VIP was no longer willing to pay DigaComm 5%. Mr. Bilbao said that 5% "did not work optically" and that Mr. Larschan was no longer willing to pay the 5% he had previously promised. Upon information and belief, VSAC and its Preferred Holders authorized and/or approved Mr. Bilbao's and Mr. Larschan's actions.

39.    DigaComm viewed Mr. Bilbao's and Mr. Larschan's position as a radical change from the prior agreement to pay 5%. Rather than allow a complete breakdown in the relationship that might threaten the GE deal, Mr. Smith and Mr. Tunick proposed a tiered fee schedule. On March 30, 2007, DigaComm and VIP agreed to a tiered fee agreement under which DigaComm would receive the following percentages of amounts generated by the GE/VIP joint venture (less the VSAC and GE capital contributions):

| Amounts generated by the joint venture | DigaComm's share |
| --- | --- |
| Up to $300 million | 5% |
| Between $300 and $500 million | 4% |
| Between $500 and $750 million | 3.5% |
| Between $750 million and 1 billion | 2.5% |
| Between $1 billion and $1.5 billion | 2.0% |
| Between $1.5 billion and $2 billion | 1.5% |
| Over $2 billion | 1% |

40.    Under the agreed upon compensation schedule, DigaComm stood to earn up to $76 million for bringing the GE opportunity to VIP's $4 billion patent portfolio.

41.    As Friday, March 30, 2007 wound to a close, VIP insisted for the first time that the letter agreement be "subject to the approval of a majority of the VSAC Preferred Holders." DigaComm objected to this change. Mr. Larschan assured Mr. Smith, however, that the approval process was a mere formality. VIP promised to recommend to the VSAC Preferred Holders that they approve the DigaComm letter agreement "as soon as practicable."

42.    As a further sign that the approval process was nothing to be concerned about, VIP solicited Andrew Seamons' approval of the DigaComm/VIP letter agreement on March 30, 2007. That same day, Mr. Seamons approved the deal on behalf of the VSAC Preferred Holders. VSAC's Mr. Bilbao informed DigaComm of Mr. Seamons' approval. (A copy of this email is attached as Exhibit 3.)

43.    In addition, Mr. Larschan told Mr. Tunick that the other VSAC Preferred Holders would "follow the lead" of Mr. Seamons. Mr. Larschan emphasized that the approval provision was not a problem because "you already have the votes."

44.    On the basis of Mr. Larschan's, Mr. Bilbao's, and Mr. Seamons' representations, DigaComm entered into a letter agreement with VIP late in the day on March 30, 2007. (A copy of this letter agreement is attached as Exhibit 4.)

45.    At all relevant times, GE approved of and was grateful for DigaComm's efforts in bringing to its attention the VIP opportunity and understood that DigaComm would receive a participation percentage for its efforts.

46.    On April 2, DigaComm coordinated a meeting in Memphis so that VSAC's Preferred Holders could meet Mr. Hall of GE in person. Because of flight delays, Mr. Smith of

DigaComm was not able to make the initial meeting. Mr. Hall reported to him that the meeting had gone well. The VSAC Preferred Holders had believed GE to be too good to be true. Mr. Hall's understanding was that the VSAC Preferred Holders were very receptive to a deal with GE, and wanted to advance the deal by meeting with the GE licensing personnel who would also be involved in the joint venture.

47.     At no point during the April 2 meeting did VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, or Pittco Capital Partners II, LP, or any VSAC Preferred Holder ever disparage DigaComm's role in the GE/VIP transaction or inform DigaComm that the VSAC Preferred Holders had yet to approve its compensation.

48.     Mr. Smith's flight arrived in time for dinner in Memphis on April 2. That dinner was attended by Smith, Mr. Hall, Mr. Larschan, and J.R. "Pitt" Hyde III's representative Mr. Seamons. At no time during this dinner did Mr. Seamons question DigaComm's participation or inform DigaComm that the VSAC Preferred Holders had not yet approved the DigaComm letter agreement. Mr. Hall also told Mr. Smith that he had informed the VSAC Preferred Holders of the importance of DigaComm to the effort and had received no objections.

49.     On May 8, a second meeting was held in Memphis so that the VSAC Preferred Holders could meet the GE licensing people. Jonathan Tunick attended this meeting on behalf of DigaComm. At no point during this meeting did VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, or Pittco Capital Partners II, LP, or any VSAC Preferred Holder ever question DigaComm's role in the GE transaction or inform DigaComm that the VSAC Preferred Holders had yet to approve its compensation.

50.     The May 8 meeting was a success — the VSAC Preferred Holders decided to proceed with the GE joint venture.

51.     On June 12, 2007, John Hall contacted Mr. Smith and informed him that GE's law firm, Latham & Watkins, needed a copy of the DigaComm letter agreement so that they could write in DigaComm's compensation to the joint venture agreement.  Mr. Smith obliged by sending Mr. Hall a copy of the DigaComm letter agreement with VIP.  Mr. Smith's letter states "I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us."  (A copy of Mr. Smith's letter is attached as Exhibit 5.)

52.     At no time did Mr. Larschan, VSAC, Mr. Seamons, Mr. Hyde, or any of VSAC's Preferred Holders object or inform Mr. Smith that the DigaComm letter agreement was invalid or that it had not yet been approved.

53.     Mr. Larschan did take action, however.  Mr. Larschan directed VIP's lawyers to object to any inclusion of DigaComm in the joint venture documents.  Upon information and belief, VSAC and its Preferred Holders authorized and/or approved of Mr. Larschan's action.  At no point did anyone inform DigaComm that VIP was once again reneging on its promise to pay DigaComm.

54.     As far as DigaComm knew, the joint venture negotiations were proceeding smoothly.  On several occasions, Mr. Smith contacted Mr. Larschan to check in.  At no time did Mr. Larschan inform Mr. Smith that there was any problem with either DigaComm's contract or the GE deal as a whole.

55.    By mid-August, DigaComm was of the belief that the joint venture closing was imminent. On August 21, 2007, Mr. Smith wrote Mr. Larschan and Mr. Bilbao to congratulate them on closing the GE deal.

56.    On August 27, 2007, Mr. Smith again wrote Mr. Larschan to congratulate him on closing the GE deal.

57.    Mr. Smith received no response to his emails until September 6, 2007. On that day, Mr. Larschan dropped a bombshell: VIP was refusing to pay DigaComm because "a majority of the VSAC Preferred Holders had not approved the deal." He offered to pay DigaComm $250,000 for its efforts in securing a $4 billion opportunity with one of the world's largest companies.

58.    An angered Mr. Smith informed Mr. Larschan that he would contact GE and his litigation counsel about this unfortunate development.

59.    On September 7, 2007, VIP officially reneged on its obligations to DigaComm. In a letter of that day, Mr. Larschan informed Mr. Smith that,

> [o]n August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee. At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein. Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth herein. Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

(A copy of this letter is attached as Exhibit 6.)

13

60.    At no time prior to September 6, 2007, did anyone from VIP, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, or any VSAC Preferred Holders ever inform anyone from DigaComm that the VSAC Preferred Holders had not approved the DigaComm letter agreement. To the contrary, VIP, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and the other VSAC Preferred Holders took pains to give DigaComm the illusion that everything was on track.

61.    DigaComm brings this action to recover damages equal to 5% of the value of the joint venture's patent portfolio.

## COUNT I
## (FRAUD)

62.    DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

63.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP conspired with and aided and abetted VIP and Bradley Larschan to defraud DigaComm out its compensation for facilitating a $4 billion joint venture between VIP and GE.

64.    VIP and Mr. Larschan made material misrepresentations to DigaComm concerning the status of its compensation in order to induce DigaComm to continue to facilitate the GE transaction. Upon information and belief, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP authorized and/or approved of VIP's and Mr. Larschan's misrepresentations.

14

65.     VIP and Mr. Larschan knew their statements were false at the time they made them.

66.     VIP and Mr. Larschan intended that DigaComm would rely on these misrepresentations.

67.     DigaComm relied on those misrepresentations.

68.     Mr. Seamons participated in the fraud and acted in furtherance of the conspiracy by indicating his approval of the DigaComm/VIP letter agreement and causing his approval to be communicated to DigaComm by VSAC's General Counsel, J. Raymond Bilbao.  Upon information and belief, VSAC, its Preferred Holders, and Mr. Hyde authorized and/or approved Mr. Seamons' action.

69.     In addition, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP participated in the fraud and acted in furtherance of the conspiracy by rejecting DigaComm's compensation in the face of Mr. Seamons' prior approval.

70.     While complete details of the conspiracy are exclusively within the knowledge and control of the conspirators, DigaComm is aware of the following facts giving rise to a strong inference of VSAC's, Mr. Seamons', Mr. Hyde's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's participation in a conspiracy to defraud DigaComm:

(a)     The provision purporting to condition DigaComm's compensation on the approval of VSAC's Preferred Holders was an eleventh-hour addition to the DigaComm/VIP letter agreement.

(b)     VIP's Mr. Larschan and VSAC's General Counsel, J. Raymond Bilbao, told DigaComm repeatedly that the approval condition "would not be a problem."

15

(c)    DigaComm was told that Mr. Seamons, on behalf of the 30% preferred interest holding in VSAC controlled by Mr. Hyde, approved of its fee and that the remaining VSAC Preferred Holders would follow Mr. Seamons' lead.

(d)    VSAC's Preferred Holders attended multiple meetings regarding the GE deal and at no time did they indicate that DigaComm's compensation should be rejected.

(e)    VIP claims that it recommended that VSAC's Preferred Holders approve DigaComm's compensation, demonstrating that DigaComm complied with its obligations.

(f)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP rejected DigaComm's compensation only months after Mr. Seamons had communicated their approval and in the face of repeated assurances that approval "would not be a problem."

(g)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP had no basis upon which to deny DigaComm its compensation.

(h)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $200 million.

71.    Mr. Hyde is liable for Mr. Seamons' actions in furtherance of the conspiracy to defraud DigaComm under the theory of *respondeat superior*.  Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

72.    Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

73.    VIP and VSAC share a unity of interest such that their separate personalities no longer exist and VIP is, in reality, a sham for VSAC.

74.    While the complete details of the relationship between VIP and VSAC are exclusively within their possession and control and unavailable to outsiders like DigaComm, DigaComm is aware of the following facts indicating that VIP is the mere alter ego of VSAC:

16

(a)    VSAC owns 100% of the membership interests in VIP.

(b)    There is considerable overlap between the officers and employees of VIP and VSAC. DigaComm is aware that J. Raymond Bilbao, VSAC's General Counsel, is also an employee of VIP. In addition, DigaComm is aware that Andrew Seamons is both the Chairman of VIP's Board and a representative of VSAC Preferred Holders Pittco Capital Partners, LP and Pittco Capital Partners II, LP. Upon information and belief, other officers and employees of VSAC are also officers and employees of VIP.

(c)    VIP and VSAC currently share the office space at 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117. Prior to September 2007, both VSAC and VIP maintained offices at 3150 Lenox Park Boulevard, Suite 108, Memphis, Tennessee, 38115.

(d)    VSAC dominates and controls VIP such that VIP lacks the authority to enter into agreements without approval from VSAC and VSAC's Preferred Holders. For example, VIP claims that it could not undertake the GE transaction without the approval of VSAC and VSAC's Preferred Holders.

(e)    The GE/VIP joint venture was not finalized until after VSAC's Preferred Holders blessed the GE personnel involved.

75.    Adherence to the fiction that VIP and VSAC are separate entities would sanction a fraud and promote injustice.

76.    DigaComm believes that VSAC is liable for VIP's and Mr. Larschan's misrepresentations under the doctrine of alter ego because VSAC and VIP have ignored the formalities of separate corporate existence. But because the full details of VSAC's relationship with VIP are uniquely within the knowledge of VSAC and VIP, DigaComm also alleges that VSAC is liable for VIP's and Mr. Larschan's misrepresentations under the doctrine of direct participation.

77.    VIP's failure to compensate DigaComm for its efforts in facilitating a $4 billion transaction between VIP and GE can be traced directly to VSAC through the actions of VSAC's Preferred Holders in rejecting DigaComm's compensation without justification.

17

78.    VSAC has interfered with VIP's operations in a way that far surpasses the control ordinarily exercised by a parent company as an incident of ownership. While the details of VSAC's interference in VIP's operations are within the exclusive knowledge and control of VSAC and VIP and are unavailable to an outsider like DigaComm, DigaComm is aware of the following facts strongly suggestive of undue interference by VSAC in VIP's operations:

(a)    VSAC and its Preferred Holders rejected DigaComm's compensation in the face of VIP's recommendation that DigaComm's compensation be approved.

(b)    VSAC and its Preferred Holders exercised continuous and direct supervision over the VIP/GE joint venture, including by attending meetings with GE representatives.

(c)    VSAC and its Preferred Holders had the ability to veto the GE joint venture at any time, regardless of VIP's desire to continue with the joint venture.

(d)    The GE/VIP joint venture was not finalized until after VSAC's Preferred Holders blessed the GE personnel involved.

79.    DigaComm seeks compensatory and punitive damages.

## COUNT II
## (TORTIOUS INTERFERENCE WITH THE MARCH 9, 2007 CONTRACT)

80.    DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

81.    DigaComm's March 9, 2007 agreement with VIP is a valid and enforceable contract.

82.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP were aware of the March 9, 2007 agreement and were aware that it was a valid and enforceable agreement.

18

83.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP purposefully interfered with VIP's performance of the March 9, 2007 agreement.

84.    Upon information and belief, Mr. Hyde also used Pittco Capital Partners, LP and Pittco Capital Partners II, LP to interfere with DigaComm's contractual relationship with VIP.

85.    Mr. Hyde is liable for Mr. Seamons' interference under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

86.    Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

87.    VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference was done with actual malice. While the complete details surrounding the defendants' state of mind when they interfered with the March 9, 2007 agreement are peculiarly known to them and not to outsiders like DigaComm, DigaComm is aware of the following indicia of actual malice:

(a)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP interfered with the March 9, 2007 agreement even though that interference was opposed to their economic interests. All were aware that reneging on the March 9, 2007 agreement could cause GE to back out of the joint venture, thus upsetting a $4 billion opportunity.

(b)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP interfered with DigaComm's compensation weeks after authorizing and/or approving of their agent Mr. Larschan's agreement to pay DigaComm 5%.

19

    (c)      VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP had no basis upon which to assert that DigaComm was not entitled to its agreed-upon compensation.

    (d)      VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $200 million.

88.      DigaComm has suffered damages as a result of VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference.

89.      DigaComm seeks damages in the amount of $200 million.

## COUNT III
## (TORTIOUS INTERFERENCE WITH THE MARCH 30, 2007 CONTRACT)

90.      DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

91.      DigaComm's March 30, 2007 letter agreement with VIP is a valid and enforceable contract.

92.      VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP were aware of the March 30, 2007 letter agreement and were aware that it was a valid and enforceable agreement.

93.      VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP purposefully interfered with VIP's performance of the March 30, 2007 letter agreement.

94.      Upon information and belief, Mr. Hyde also used Pittco Capital Partners, LP and Pittco Capital Partners II, LP to interfere with DigaComm's contractual relationship with VIP.

95.    Mr. Hyde is liable for Mr. Seamons' interference under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

96.    Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

97.    VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference was done with actual malice. While the complete details surrounding the defendants' state of mind when they interfered with the March 30, 2007 letter agreement are peculiarly known to them and not to outsiders like DigaComm, DigaComm is aware of the following indicia of actual malice:

(a)    The provision purporting to condition DigaComm's compensation on the approval of VSAC's Preferred Holders was an eleventh-hour addition to the DigaComm/VIP letter agreement.

(b)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP interfered with the March 30, 2007 letter agreement even though that interference was opposed to their economic interests. All were aware that reneging on the March 30, 2007 letter agreement could cause GE to back out of the joint venture, thus upsetting a $4 billion opportunity.

(c)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP attended meetings relating to the GE/VIP joint venture and at no point indicated that they felt that DigaComm's compensation should be rejected.

(d)    VIP claims that it recommended that VSAC's Preferred Holders approve DigaComm's compensation, demonstrating that DigaComm complied with its obligations.

(e)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP rejected DigaComm's compensation only months after Mr. Seamons had communicated their approval and in the face of repeated assurances by their agent Mr. Larschan that approval "would not be a problem."

21

(f)  VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP had no basis upon which to deny DigaComm its compensation.

(g)  VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $76 million.

98.  DigaComm has suffered damages as a result of VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference.

99.  DigaComm seeks damages in the amount of $76 million.

## COUNT IV
### (UNJUST ENRICHMENT)

100.  DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

101.  DigaComm has conferred a benefit on VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP by alerting them to the possibility of a transaction with GE and by facilitating that transaction.

102.  Upon information and belief, the benefit bestowed upon Mr. Hyde flowed to him via his partnership interest in Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

103.  Upon information and belief, the benefit bestowed upon Mr. Seamons flowed to him via his partnership interest in Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

104.  Instead of paying DigaComm its fair share of this windfall, VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP seek to retain the benefits of the GE joint venture for themselves.

22

105.    VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's retention of these benefits will result in an injustice.

106.    DigaComm seeks damages equal to 5% of the value of the joint venture's patent portfolio.

## PRAYER FOR RELIEF

WHEREFORE, DigaComm prays that it be awarded the following relief:

(a)     Damages against VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital
        Partners, LP, and Pittco Capital Partners II, LP in an amount to be determined at
        trial, but not less than $200 million;

(b)     A declaration that VSAC and VIP are alter egos and that VSAC is liable to
        DigaComm for VIP's conduct on alter ego grounds, or, in the alternative, that
        VSAC is liable for VIP's conduct under a direct participation theory;

(c)     Attorneys' fees and other costs of collection;

(d)     Prejudgment and postjudgment interest;

(e)     Punitive damages;

(f)     Such other relief as the Court deems appropriate.


## JURY DEMAND

DigaComm demands a jury trial for all issues so triable.


Respectfully submitted,


DigaComm, LLC

By: _____

One of its attorneys


Reed S. Oslan, P.C.
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Tel: 312/861-2157
Fac: 312/861-2200

# Exhibit

# 1

*eBay v. MercExchange:* More Than A Century of Precedent Casually Overturned

> "[A]n inventor receives from a patent the right to
> exclude others from its use . . . . [T]he right can only
> retain its attribute of exclusiveness by a prevention of
> its violation. Anything but prevention takes away the
> privilege which the law confers upon the patentee."
> - Continental Paper Bag Co. v. E. Paper Bag Co. (1908)

> "[T]he decision whether to grant or deny injunctive
> relief rests within the equitable discretion of the district
> courts . . . . [S]uch discretion must be exercised
> consistent with traditional principles of equity, in patent
> disputes no less than in other cases . . .."
> - eBay v. MercExchange (2006)

*By*
Bradley R. Larschan

## I.     INTRODUCTION

Some call it cryptic and sweeping. Others find it unremarkable. Many still wonder to what degree it will change the property rights of inventors and patent owners facing willful, recalcitrant and well-funded defendants.

Almost one year after the Supreme Court's terse decision in *eBay Inc. and Half.com, v. MercExchange, L.L.C,*[1] more questions have been asked than answered about the role of injunctive relief in patent infringement litigation, and whether the Court casually overturned more than 100 years of precedent.

This paper begins with a discussion of the historical development of the issuance of permanent injunctions in patent infringement cases. It then goes on to review *eBay* and the Supreme Court's holding that the four-factor test must be met for a permanent injunction to issue. Next, the discussion turns to two theories of the *eBay* decision — whether the Court (1) was correct that the four-factor test has been historically applied and the Federal Circuit Court of Appeals strayed or (2) overturned more than a century of precedent. The discussion then turns to argue that, as a result of *eBay*, district must engage in a subjective analysis of whether a patent owner is 'good' or 'bad' before applying the four-factor test, after which it considers the significant public policy implications of *eBay*. This paper concludes that *eBay* has profoundly altered the time-tested balance of intellectual property rights established by the courts and the free market with significant unintended consequences for a broad swath of patent owners.

---

[1]  — U.S. —, 126 S. Ct. 1837 (2006).

## II.    SETTING THE STAGE

U.S. "patent law is the execution of a policy having its first expression in the Constitution"[2] which gives Congress the power and responsibility "to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries."[3]  Congress promulgated the first patent law in 1790 and then, as today, "patents are contracts between the United States and the patentee".[4]  Patent rights are granted as consideration for the invention disclosure, not for the patentee's use of the invention.[5]  There is no requirement that the patentee make, use or sell a patented invention.[6]

Over time, a body of common law evolved[7] – guided in no small part by the Supreme Court – finding that a patent provides the patent owner the right to exclude others and, therefore, ordinarily affords plaintiffs the right to enjoin a defendant found to be willfully infringing one or more claims of a valid patent.[8]  Prior to *eBay*, "whenever

---

[2]  *Continental Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 424 (1908).

[3]  U.S. CONST., art. I, § 8, cl. 8. The Patent and Copyright Clause appears to have been first proposed in 1787 by James Madison and Charles Pinckney. In THE FEDERALIST No. 43, Madison wrote:

> The utility of this power will scarcely be questioned. The copy right of authors has been solemnly adjudged in Great Britain to be a right at common law. The right to useful inventions, seems with equal reason to belong to the inventors. The public good fully coincides in both cases, with the claims of the individuals.

THE FEDERALIST No. 43, at 217 (Madison) (Bantam Books ed., 1982).

The Patent and Copyright Clause appears to have been included in the Constitution without debate. *See* James Madison, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787 580-81 (1987).

[4]  *Rubbermaid Inc. v. Conitco Intern., Inc.*, 381 F. Supp. 666, 671 (D. Mo. 1974). *See also US v. Marifarms, Inc.*, 345 F. Supp. 858, 861 (D. Del. 1972) ("a patent is a contract between the inventor and the Government."); *Davis Airfoils v. US*, 124 F. Supp. 350, 351 (Ct. Cl. 1954) ("A patent is a contract between the inventor and the public . . ..").

[5]  *Woofter v. Carlson*, 367 F.2d 436 (Cust. & Pat. App. 1966), *quoting Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520 (2nd Cir. 1946) (L. Hand, J.).

[6]  *Continental* at 424-30. *See also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) ("There is no requirement in this country that a patentee make, use, or sell its patented invention.").

[7]  "But what are the rights of ownership? They are substantially the same as those incident to possession. Within the limits prescribed by policy, the owner is allowed to exercise his natural powers over the subject-matter uninterfered with, and is more or less protected in excluding other people from such interference. The owner is allowed to exclude all, and is accountable to no one." Oliver Wendel Holmes, THE COMMON LAW 246 (1881).

[8]  *See, e.g., Rite-Hite Corp., Id.* ("courts have in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest.").

There are public policy and equitable limitations to the grant of a permanent injunction. *See, e.g.*, note 54, *infra*. Moreover, the courts will not grant a permanent injunction where there is a plain and adequate

---

© 2007 by Bradley R. Larschan

this court has had occasion to speak, it has decided that an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[9]  As Chief Justice Marshall observed, "for his exclusive enjoyment of [the patent right] during that time, the public faith is pledged."[10]

· But what precisely is the nature of a plaintiff's "right" to "exclude others" and exclusively enjoy a patent during its life?

This was at the heart of *Continental*, where the Court addressed the question of whether the plaintiff was entitled to an injunction where for 17 years it never put the invention into "effect or use" because it was more profitably used as a tool to block competition.  The defendant argued

> it is contrary to equity to suppress a useful and established business, like that which the defendant is prosecuting with its paper bag machines, at the request of a complainant which simply owns one paper bag machine patent that has never been employed by that complainant in any way in any paper bag machinery, and because the complainant in this case has a plain, adequate, and complete remedy at law for any infringement which may have been done . . . .[11]

The defendant further argued that the district court lacked authority to issue the injunction because the statutory basis[12] for equitable relief was not met.[13]  *Continental* countered that it had the absolute right to use or not use its patent.

The Court began with an exploration of the nature of the right conferred upon patent owners, finding the Constitution and patent laws intended "to provide for an exclusive right to inventors to make, use, and vend their inventions."[14]  The Court noted that at the entry into force of the Constitution, only a remedy at law existed for patent infringement, but this was expanded in 1819 to encompass equitable relief.[15]  After a

---

remedy at law, such as where a patent has expired and "damages in money will afford complete relief". *American Safety Device Co. v. Kurland Chemical Co.*, 68 F.2d 734, 735 (2nd Cir. 1934).

[9] *Continental* at 425.

[10] *Id., citing with approval Grant v. Raymond*, 6 Pet. 242, 243, 31 U.S. 218, 219 (1832).

[11] *Continental* at 407.

[12] The statute provided: "The several courts vested with jurisdiction of cases arising under the patent law shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent, . . . ." *Id.* at 423 (*citing* § 4921 (U. S. Comp. Stat. 1901, p. 3395)).

[13] *Continental* at 423.

[14] *Id.* at 424.

[15] *Id.* at 424-25.

© 2007 by Bradley R. Larschan

3

consistent series of cases,[16] by the time of *United States v. American Bell Telephone Co.*,[17] the Court found "the only effect of the patent is to restrain others from manufacturing and using that which he has invented."[18] The

> inventor could have kept his discovery to himself; but, to induce a disclosure of it, Congress has, by its legislation, made in pursuance of the Constitution, guaranteed to him an exclusive right to it for a limited time, and the purpose of the patent is to protect him in this monopoly . . . . And it was pointed out that the monopoly which he receives is only for a few years. The court further said: 'Counsel seem to argue that one who has made an invention and thereupon applies for a patent therefor occupies, as it were, the position of a quasi trustee for the public; that he is under a sort of moral obligation to see that the public acquires the right to the free use of that invention as soon as is conveniently possible. We dissent entirely from the thought thus urged. The inventor is one who has discovered something of value. It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention.'[19]

In *Continental*, the plaintiff chose not to use the invention disclosed in its patent because it was more profitable to use its existing machinery than to build one covered by its patent rights. The Court found this not to be "unreasonable",[20] adding, "[a]s to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question

---

[16] *See, e.g., Grant v. Raymond*, 6 Pet. 242, 243, 31 U.S. 218, 8 L. ed. 384, 385 (1832) (Marshall, C.J.) ("The great object and intention of the [patent law] is to secure to the public the advantages to be derived from the discoveries of individuals; and the means it employs are the compensation made . . . by the exclusive right to make up and sell the things discovered for a limited time."); *Bloomer v. McQuewan*, 14 How. 539, 55 U.S. 539, 14 L. ed. 532 (1852) (Taney, C.J.) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."); *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878) ("It is true that letters-patent, pursuing the words of the statute, do, in terms, grant to the inventor, his heirs and assigns, the exclusive right to make, use, and vend to others his invention or discovery, throughout the United States and the Territories thereof."); *E. Bement & Sons v. National Harrow Co.*, 186 US 70, 91, 46 S. L. ed. 1058, 1068, 22 Sup. Ct. Rep. 747, 755 (1902) ("the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly . . . .").

[17] 167 U.S. 224 (1897).

[18] *Continental* at 424.

[19] *Id.,* quoting *American Bell*.

[20] *Continental* at 429.

© 2007 by Bradley R. Larschan                                                          4

of motive."[21] The Court went on to observe that "[i]t is manifest . . . that Congress has not 'overlooked the subject of nonuser of patented inventions.'"[22] In finding the Plaintiff was entitled to an injunction, the Court held:

> It hardly needs to be pointed out that the right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee. If the conception of the law that a judgment in an action at law is reparation for the trespass, it is only for the particular trespass that is the ground of the action. There may be other trespasses and continuing wrongs and the vexation of many actions. These are well-recognized grounds of equity jurisdiction, especially in patent cases . . . .[23]

Until *eBay*, the Court has not questioned the presumption that an injunction should issue against willful infringers absent special circumstances.[24]

## III.    THE EBAY DECISION

MercExchange successfully prosecuted a patent infringement suit in the US District Court for the Eastern District of Virginia against online auction giant eBay and its wholly-owned subsidiary, Half.com.[25] The district court, however, denied MercExchange a permanent injunction barring the defendants from continuing to infringe the patent[26] and, instead, awarded a compulsory license to eBay, relying heavily on

---

[21] *Id., citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 46 L. ed. 684, 22 Sup. Ct. Rep. 431 (1902).

[22] *Continental* at 429.

[23] *Id.* at 430.

[24] *See, e.g., Dawson Chemical Co. v. Rohm & Hass Chemical Co.*, 448 U.S. 176, 215 (1980) ("the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ("The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."); *Sears Roebuck Co. v. Stiffel Co.*, 376 U.S. 225, 229-30 (1964) ("The grant of a patent is the grant of a statutory monopoly; indeed, the grant of patents in England was an explicit exception to the statute of James I prohibiting monopolies. Patents are not given as favors, . . . but are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention. During that period of time no one may make, use, or sell the patented product without the patentee's authority."); *United Shoe Machinery Corporation v. U.S.*, 258 U.S. 451, 463 (1922) ("From an early day it has been held by this court that the franchise secured by a patent consists only in the right to exclude others from making, using, or vending the thing patented without the permission of the patentee. This definition of the rights of the patentee has been the subject of frequent recent decisions of this court, and has been approved and applied in [numerous cases]." (Internal citations omitted.))

[25] 275 F. Supp. 2d 695 (2003).

[26] It should be observed that in refusing to grant injunctive relief, the district court failed to cite, much less distinguish, *Continental*. This is remarkable because, in explaining why MercExchange would not be irreparably harmed, the opinion stresses that the "plaintiff does not practice its inventions and exists merely

© 2007 by Bradley R. Larschan

MercExchange's demonstrated willingness to license and lack of commercial activity using the patent. MercExchange appealed and the Federal Circuit Court of Appeals reversed, applying the "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances".[27]

In writing for a supposedly unanimous[28] Court, Justice Thomas not altogether correctly interprets the *Continental* case and breathtakingly all but ignores a long line of Supreme Court decisions consistent with the presumption that an injunction should issue absent special circumstances. Instead, the terse opinion begins by – *petitio principii* – citing 35 USC § 283,[29] under which district courts "may grant injunctions in accordance with the principles of equity" and then plows into a recitation of the well-settled four-factor test a plaintiff must ordinarily satisfy to receive a permanent injunction,[30] concluding that "[t]hese familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, 'a major departure from the long tradition of equity practice should not be lightly implied.'"[31]

---

to license its patented technology to others." *Id.* at 712. Instead, the trial court relied heavily on *Foster v. American Machine & Foundry Co.*, 492 F.2d 1317 (2d Cir. 1974) in confining MercExchange to a legal remedy. *Id.* at 713. *Foster*, too, failed to distinguish – or even cite – *Continental* in concluding that "[t]o grant [the patentee] a compulsory royalty is to give him half a loaf. In the circumstance of his utter failure to exploit the patent on his own, that seems fair." *Foster*, 492 F.2d at 1324. It is difficult to reconcile this conclusion with *Continental*.

The Court addressed this issue more than a century ago. In *Hoe v. Knap*, 27 Fed. 204, 212 (N.D. Ill. 1886), the question was "whether the court will grant an injunction in favor of the owner of a patent who has not, after a reasonable time, put it into use, against another who is using it." It held that "under a patent which gives a patentee a monopoly, he is bound either to use the patent himself or allow others to use it on reasonable or equitable terms . . . ." The *Continental* Court expressly rejected *Hoe's dictum*, stating: "If he [a patentee] see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own . . . his title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it." 210 U.S. at 425, *quoting Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. 288, 294-95 (6th Cir. 1896) ("The dictum found in [*Hoe*] is not supported by reason or authority.")

[27] 401 F. 3d 1323, 1339 (2005).

[28] Justice Alito did not participate.

[29] Section 283 of the Patent Act provides that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

[30] Justice Thomas wrote for the Court: "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 126 Sup. Ct. at 1838.

[31] *Id.*

© 2007 by Bradley R. Larschan

6

Once the Court assumed away more than a century of precedent, its holding is straight forward.[32] The courts below did not "fairly" apply the four-factor test so the case was remanded to the district court with the instruction that in determining whether or not an injunction should be issued "that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[33]

Complicating matters were two concurring opinions. The Chief Justice, joined by Justices Ginsburg and Scalia, observes that injunctive relief has been historically granted upon a finding of patent infringement "in the vast majority of patent cases" because of the "difficulty of protecting a right to exclude through monetary remedies."[34]

Justice Kennedy, joined by Justices Breyer, Stevens and Souter, suggests that patent cases should not fall outside the norm: "the lesson of the historical practice, therefore, is most helpful and instructive when the circumstances of a case bear substantial parallels to litigation the courts have confronted before."[35] But Justice Kennedy notes that the "nature of the patent being enforced and the economic function of the patent holder present considerations quite unlike earlier cases", taking a swipe at business method patents (which he criticizes for their "potential vagueness and suspect validity") and patent licensing and enforcement companies (that acquire patents merely to assert them).[36]

Thus, the unanimous opinion in *eBay* is also a 3-2-3 split, and one would be hard pressed to draw any broad, lasting conclusion … or even whether *Continental* is overturned.

## IV.    DIFFERING INTERPRETATIONS

Since *eBay,* at least two principal interpretations have arisen with respect to the meaning and effect of the Court's holding.

---

[32] Justice Thomas also attempts to analogize patent and copyright law. While a critical analysis of this statement deserves academic scrutiny, it is beyond the scope of this paper. *See, generally,* Robert E. Thomas, *Vanquishing Copyright Pirates and Patent Trolls: The Divergent Evolution of Copyright and Patent Laws,* 43 AM. BUS. L.J. 689 (2006).

[33] 126 Sup. Ct. at 1841.

[34] *Id.* (Roberts, C.J., concurring).

[35] *Id.* at 1842 (Kennedy, J., concurring).

[36] *Id.*

© 2007 by Bradley R. Larschan

### A. The Four-Factor Test Has Been Applied All Along

The Court's opinion can be read to stand for the proposition that the four-factor test has historically been applied to justify the grant of a permanent injunction.

> These familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, "a major departure from the long tradition of equity practice should not be lightly implied." Nothing in the Patent Act indicates that Congress intended such a departure. To the contrary, the Patent Act expressly provides that injunctions "may" issue "in accordance with the principles of equity."[37]

So, it is the Federal Circuit Court of Appeals that strayed by routinely granting injunctive relief under a supposed

> "general rule," unique to patent disputes, "that a permanent injunction will issue once infringement and validity have been adjudged." The court further indicated that injunctions should be denied only in the "unusual" case, under "exceptional circumstances" and "'in rare instances . . . to protect the public interest.'" . . . [T]he Court of Appeals erred in its categorical grant of such relief.[38]

This interpretation is also urged by Justice Kennedy, who suggests in his concurring opinion that "[t]o the extent earlier cases establish a pattern of granting an injunction against patent infringers almost as a matter of course, this pattern simply illustrates the result of the four-factor test in the contexts then prevalent."[39]

But it is difficult to reconcile this position with precedent.[40]

---

[37] 126 Sup. Ct. at 1839 (internal citations omitted).

[38] *Id.* at 1841 (internal citations omitted).

[39] *Id.* at 1842 (Kennedy, J., concurring).

[40] It is interesting how consistently the Federal Circuit and other courts have applied this standard prior to *eBay*. In *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226. 1247 (Fed. Cir. 1989), the court noted

> Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property. "[T]he right to exclude recognized in a patent is but the essence of the concept of property". It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it. . . . This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm."

In *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1564 (Fed. Cir. 1984) the court stated:

© 2007 by Bradley R. Larschan

At the time of *Continental*, the patent law provided: "The several courts vested with jurisdiction of cases arising under the patent law shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent . . . ."[41] The language is similar to today's law,[42] so it might be expected that the *Continental* Court would analyze a request for injunctive relief similarly to the *eBay* Court, although applying (as Justice Kennedy observed) then prevailing values and standards. In *Continental*, however, the Court stated:

> It may be well . . . to consider what rights are conferred upon [the patent owner]. The source of the right is, of course, the law, and we are admonished at the outset that we must look for the policy of a statute, not in matters outside of it,-not to circumstances of expediency and to supposed purposes not expressed by the words. The patent law . . . provide[s] for an exclusive right to inventors to make, use, and vend their inventions. In other words, the language of complete monopoly has been employed; . . . [It is] a right so explicitly given and so complete that it would seem to need no further explanation than the word of the statute. . . . [T]he only effect of the patent is to restrain others from manufacturing and using that which he has invented. . . . and the purpose of the patent is to protect him in this monopoly . . . . It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention."[43]

---

Since Nyman neither makes nor sells the infringing display racks, the district court's injunction gives Trans-World no meaningful relief. [The Patent Law] authorizes district courts to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." Although a district court has discretion whether to enter an injunction, the exercise of this discretion cannot be arbitrary. A patent gives "the right to exclude others from making, using or selling the invention." (Internal citations omitted.)

*See also Cornell v. Sears Roebuck & Co.*, 722 F.2d 1542 (Fed. Cir. 1983) ("the right to exclude recognized in a patent is but the essence of the concept of property."); *Smith Intern., Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed. Cir. 1983) (grant of patent is grant of right to invoke the state's power to order to exclude others from utilizing patentee's discovery without his consent).

**[Cite other cases from Federal Circuit and its predecessor.]**

[41] *Continental* at 423.

[42] 35 U.S.C. § 283, which provides: "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

[43] *Continental* at 424.

© 2007 by Bradley R. Larschan

9

In *Continental*, the defendant pointed out that the plaintiff held the patent for 17 years and did not use it in its business, even though it could have, arguing that

> it is contrary to equity to suppress a useful and established business, like that which the defendant is prosecuting with its paper bag machines, at the request of a complainant which simply owns one paper bag machine patent that has never been employed by that complainant in any way in any paper bag machinery . . . .[44]

The Court flatly rejected this contention. Even if the patent owner held the patent for its full life and never put it into "use or effect", this was its absolute right. "As to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."[45]

The *Continental* Court found the remedy for willful violation of a patent owner's rights lies in equity, not law, and that an injunction should issue as a matter of course unless equity demands otherwise – for example, if outweighed by the public interest.[46]

There is no hint – not even a morsel – the *Continental* Court believed the nature of the patent right is anything other than a "complete monopoly".[47] The Court noted the competitive relationship between the parties but did not rely upon it to declare the patent owner's right is "to restrain others from manufacturing and using that which he has invented." The patent is its "absolute property" and "the purpose of the patent is to protect him in this monopoly . . .." The Court expressly rejected the defendant's argument that the plaintiff "has a plain, adequate, and complete remedy at law for any infringement which may have been done . . .."[48] Even though monetary damages are available, the Court would not withhold issuing an injunction because "an inventor receives from a patent the right to exclude others from its use . . . . [T]he right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee."[49]

---

[44] *Id.* at 407.

[45] *Id.* at 429.

[46] Another ground might be that the infringement is too "trifling". *Condenser Corp. of America v. Micamold Radio Corp.*, 145 F.2d 878, 880 (2nd Cir. 1944).

[47] The monopoly created by a patent is an exception to the general rule against monopolies. *Commissioner of Patents v. Deutsche Goldund-Silber-Scheideanstalt Vormals Roessler*, 397 F.2d 656, 663 (D.C. Cir. 1968).

[48] *Continental* at 407.

[49] *Id.* at 430.

© 2007 by Bradley R. Larschan

10

B. Only Plaintiffs That Make Or Sell Something Are Entitled To An Injunction

Perhaps the most widely held interpretation of *eBay* is that it requires a plaintiff – as a threshold equitable consideration – must make or sell a directly competitive product or service to be entitled to an injunction upon a district court's finding of willful infringement.

The *eBay* opinion observes that "the Patent Act also declares that 'patents shall have . . . the right to exclude others from making, using, offering for sale, or selling the invention'."[50] But this right is overarched by the application of equitable principles. The Court rebukes the district court, which

> adopt[ed] certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases. Most notably, it concluded that a "plaintiff's willingness to license its patents" and "its lack of commercial activity in practicing the patents" would be sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue.[51]

In criticizing the district court's exclusion of a "broad swath of cases" because "some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves",[52] the Court appears to be signaling that it is not only acceptable but required that the district courts engage in a subjective inquiry into the identity and nature of the patent owner. 'Good' "patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so."[53] 'Bad' patent owners, presumably, cannot. This is a sharp break with precedent. Courts have historically questioned whether patents have been asserted unreasonably[54] but no Court has

---

[50] 126 Sup. Ct. at 1840 (internal citations omitted).

[51] *Id.* The district court also relied principally on *Foster* with regard to the balance of hardships when it wrote: "Any harm suffered by the plaintiff, by the defendants' infringement of the patents, can be recovered by way of damages." *Foster*, 275 F. Supp. 2d at 714. Thus, the first three factors relevant to equitable relief seem ultimately to have collapsed into one.

[52] 126 Sup. Ct. at 1840.

[53] *Id.*

[54] *See, e.g., Continental*, 210 U.S. at 429, *passim*. Courts have also held that patent misuse may result in forfeiture of all rights. *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488 (1942) (conditioning patent use on purchase of unpatented supplies); *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) (conditioning use on agreement to pay royalties beyond patent term). In some circumstances, compulsory licensing may be ordered. *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 59 (1973) (compulsory licensing is a "well

© 2007 by Bradley R. Larschan

11

previously distinguished between socially acceptable (*e.g.*, university researchers) and socially unacceptable patent owners (*e.g.*, the poor and most of the middle class).[55] Indeed, the *Continental* Court expressly stated that "exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, *without question of motive.*"[56]

Notwithstanding the Court's statement that "a major departure from the long tradition of equity practice should not be lightly implied" – the Court does precisely this by breaking with precedent in finding that remedies at law (rather than equity) are henceforward the norm. This is where the Court's opinion begins and ends – that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[57]

Since *eBay*, at least 14 patent infringement decisions have been rendered and the district courts have granted injunctive relief only where plaintiffs make or sell a directly competitive product or service.

1. Denial of Injunction

District courts have denied plaintiff's motion for injunction in the following four cases where plaintiffs did not make or sell a product or service in direct competition with the defendant.

In *z4 Technologies v. Microsoft Corporation and Autodesk, Inc.*,[58] after the jury found that the patents were willfully infringed by Microsoft, the court was the first after *eBay* to apply the four-factor test, and it denied z4's motion for a permanent injunction finding z4 failed to meet each prong of the four-factor test.

---

established form[ ] of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation adjudicated.").

[55] Consider, for example, the situation of a widow whose inventor-husband was issued a patent ten years before his death. Because of lack of the financial wherewithal to engage in patent litigation – which by any standard is very expensive – certain companies willfully infringed the patent, knowing that it would be unlikely the patent would be enforced against them. If the widow attempts to enforce the patent, she will face deep-pocketed defendants who have profited from infringing her patent – without her ability to obtain an injunction – are able to raise the financial stakes, delay the proceedings and engage in appeals to stretch out the process.

[56] 210 U.S. at 429 (emphasis supplied), *citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540 (1902).

[57] 126 Sup. Ct. at 1841.

[58] 434 F. Supp.2d 437 (E.D. Tex. Jun 14, 2006).

© 2007 by Bradley R. Larschan

The patentee argued that infringement of a patent created a rebuttable presumption of irreparable harm. The district court dismissed this argument as lacking precedential foundation, citing the Supreme Court's decision in *Amoco Production Co. v. Village of Gambell*[59] for the proposition that a presumption of irreparable harm in the context of an injunction hearing is "contrary to traditional equitable principles." Since z4 did not create any products, the court found that the first factor weighed in favor of the willful infringer.

The court looked to Justice Kennedy, whose concurring opinion in *eBay* contemplated the situation where a "patented invention is but a small component of the product the companies seek to produce". In such a situation, "legal damages may well be sufficient to compensate for the infringement . . .." Here, product activation is a very small component of the Microsoft Windows and Office software products that the jury found to infringe z4's patents. It did not relate to the software's core functionality. Moreover, Microsoft argued that its new Vista software will not utilize the infringing components. Thus, any ongoing royalty would only last for a couple of years. The court found that monetary damages were sufficient to compensate for any future infringement.

Microsoft argued that it would be enormously difficult and expensive to redesign even a small component of Microsoft office, and such an effort would delay release of its non-infringing Vista product. The court found that the balance of the hardships weigh in favor of Microsoft.

Microsoft's infringing products are widely used by individuals, businesses, institutions and the government. The court found that "any minor disruption to the distribution of the products in question . . . would have an effect on the public due to the public's undisputed and enormous reliance on these products. . . . Although these negative effects are somewhat speculative, such potential negative effects on the public weigh, even if only slightly, against granting an injunction."

In *Finisar Corp. v. The DirecTV Group, et al.*,[60] after finding willful infringement, the court denied Finisar's motion for a permanent injunction. The court found there was no irreparable harm because Finisar never sold the rights to the patent or made an attempt to practice the patented technology. The court held that a compulsory license would adequately compensate Finisar for DirecTV's future infringement. Weighing the balance of hardships and the public interest, the court noted that consumer satellite television is a two-competitor market. An injunction could have put DirecTV out of business and created a monopoly. Furthermore, the court noted that an injunction would negatively affect thousands of DirecTV employees, and 15 million DirecTV subscribers could lose their television service. The court concluded the balance of the hardships favored DirecTV and the public was best served by denying an injunction.

---

[59] 480 U.S. 531 (1987).

[60] 2006 WL 2699732 (E.D. Tex. Aug 04, 2006).

© 2007 by Bradley R. Larschan

13

In *Voda v. Cordis Corp.*,[61] after a jury found willful infringement of the plaintiff/inventor's patents concerning an angioplasty guide catheter and technique for using it,[62] the court denied plaintiff's request for a permanent injunction. The court found that the plaintiff failed to establish either irreparable injury or that monetary damages were inadequate. In rejecting the argument that irreparable harm is presumed upon establishing validity and infringement, the court observed that this argument "runs afoul of the Court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief."[63] The court characterized the alleged harm to plaintiff's exclusive licensee, non-party Scimed, as "irrelevant because Scimed elected not to sue to enforce the patent rights."[64] Finally, the Court held the damage to plaintiff's relationship with his exclusive licensee was insufficient to establish that money damages were inadequate.

In *Paice, LLC v. Toyota Motor Corp.*,[65] the court denied the plaintiff's motion for a permanent injunction after a jury found three of the defendant's hybrid vehicles infringed (but not willfully) three patents. The court applied the four-factor test, finding that the plaintiff failed to establish irreparable harm, that no presumption of such harm follows automatically from a finding of infringement, and that plaintiff's losses can be remedied by money damages in accordance with the reasonable royalty rate found by the jury.

The plaintiff unsuccessfully argued that lack of an injunction caused the failure of its licensing program. The court found no evidence to support this in the record, but that other reasons, such as plaintiff's "misrepresentations and improper business tactics," might have been factors.[66] Additionally, "because Plaintiff does not compete for market share with the accused vehicles, concerns regarding loss of brand name recognition and market share ... are not implicated."[67]

The plaintiff failed to show the inadequacy of monetary damages because it (a) did not demonstrate why other potential licensees would be less likely to take a license absent an injunction; (b) the infringed claims relate only to a small part of the overall vehicle; and (c) the defendant was offered a license throughout the post-trial motions stage of the case.

---

[61] 2006 WL 2570614 (W.D. Okl., Sept. 5, 2006).

[62] The jury awarded "a reasonable royalty of 7.5% of defendant's gross sales of the infringing catheters." *Id.* at 1.

[63] *Id.* at 5.

[64] *Id.*

[65] 2007 WL 2385139 (E.D. Tex. Jan 22, 2007).

[66] *Id.*

[67] *Id.*

© 2007 by Bradley R. Larschan

14

The balance of hardships weighed against an injunction because the impact an injunction would have on defendant's business and reputation, and that of related businesses (e.g., dealers and suppliers). On the other hand, the lack of an injunction would have little impact on plaintiff's licensing program.

## 2. Granting of Injunction

District courts have granted plaintiff's motion for injunction in the following 10 cases where plaintiffs did make or sell a product or service in direct competition with the defendant.

In *Wald v. Mudhopper Oilfield Services, Inc.*,[68] the court issued a permanent injunction, following the jury's finding that the defendant's products willfully infringed plaintiff's patented oil well treatment technology. The court found irreparable harm and inadequate remedies at law because, in addition to lost sales, plaintiff lost market share and the opportunity to maintain its own product as the industry standard. Moreover, the plaintiff alleged that because of the infringement, its "reputation for innovation" was damaged.[69] The balance of hardships and public interest both favored the plaintiff, as the plaintiff bore "the risk of future infringement, while there appears to be no harm to Defendants or the public's interest resulting from an injunction."[70]

In *TiVo, Inc. v. Echostar Communications Corp.*,[71] the court granted TiVo a permanent injunction.[72] At issue were Echostar's digital video recorders (DVRs), which the jury found willfully infringed TiVo's patents.

Applying the four-factor test, the court found a permanent injunction was appropriate, holding that TiVo established both irreparable harm and its remedy at law was inadequate because Echostar competes directly with TiVo. Because of this direct competition, TiVo could suffer a loss of market share at a critical time in the development of the nascent DVR market and it may not have the opportunity to recapture market share later. Since TiVo is a relatively new company with only one primary product, that loss of market share would cause severe injury that could not be remedied by monetary damages. The court found irreparable harm because "[t]he availability of the infringing products leads to loss of market share for Plaintiff's products."[73] The court

---

[68] 2006 WL 2128851 (W.D. Okl. July 27, 2006).

[69] *Id.* at 5.

[70] *Id.*

[71] 446 F. Supp. 2d 664 (E.D. Tex. 2006).

[72] The Federal Circuit has since entered an order staying the injunction pending resolution of Echostar's appeal.

[73] *Id.* at 669.

© 2007 by Bradley R. Larschan

found the balance of hardships weighed in favor of an injunction because the impact on TiVo of Echostar's infringement would be proportionately greater than the impact of an injunction on Echostar's business (satellite transmission), the core of which was not DVR-based. Finally, the public interest "would not be disserved by a permanent injunction" since the public "has an interest in maintaining a strong patent system",[74] moreover, the infringing products are used for entertainment, not public health or a similar key interest.

In *3M Innovative Properties Co. v. Avery Dennison Corp.*,[75] the court granted 3M's request for a permanent injunction. At issue was Avery's EZ Series Fleet Marketing Film used for advertising on vehicles. The court previously granted and modified a permanent injunction against Avery before the *eBay* decision. After *eBay*, the court vacated its earlier orders and again granted a permanent injunction. The court held 3M suffered irreparable injury and money damages were inadequate based on 3M's longstanding litigation and refusal to license the patents to Avery.[76] The court also held the balance of hardships favored an injunction "its right to exclude ... for more than 20 percent of the limited lifetime of this patent."[77] The court found the public interest would not be disserved by a permanent injunction because the case involved commercial graphics used for advertising, and did not present concerns about public health or safety.

## NEED TO DETERMINE WHETHER (1) INFRINGEMENT WAS WILLFUL AND (2) 3M MADE A COMPETITIVE PRODUCT. ASK FISH.

In *Rosco, Inc. v. Mirror Lite Co.*,[78] the court granted an injunction following a finding that Rosco infringed Mirror Lite's patented mirror technology. The court rejected Rosco's argument an injunction was unnecessary because Rosco had stopped manufacturing the infringing products, noting that an injunction should be denied only when "the evidence is very persuasive" that there will never be any future infringement. A defendant's promise to cease is not enough. The court noted that because the parties were direct competitors and Mirror Lite manufactured a mirror covered by its patent, a mandatory licensing scheme would not adequately compensate Mirror Lite.[79] The court found there would be no harm to the public, which could purchase mirrors from Mirror Lite instead of Rosco.

---

[74] *Id.* at 670.

[75] 2006 WL 2735499 (D. Minn. Sept. 25, 2006).

[76] "3M has spent nearly five years litigating to protect its interest in this patent and has consistently refused to execute a licensing agreement with Avery. Having lost at trial, Avery wants to force 3M to grant a license that 3M refused to grant before trial. The Court will not disturb 3M's determination that its business interests will not be served by the licensing of this product." *Id.* at 1.

[77] *Id.* at 2.

[78] 2006 WL 2844400 (E.D.N.Y. Sept. 29, 2006).

[79] *Id.* at 5.

© 2007 by Bradley R. Larschan

16

In *Visto Corp. v. Seven Networks, Inc.*,[80] the court granted Visto's motion for permanent injunction.[81] Three products were found to willfully infringe each of the three patents at issue.

The court noted that the parties are direct competitors in the mobile email market and, even though other companies also competed in the same market space, "this fact weighs heavily in the court's analysis. Intellectual property enjoys its highest value when it is asserted against a direct competitor in the plaintiff's market."[82]

Visto demonstrated the inadequacy of legal remedies, even though the jury made a large damage award. While "[t]hose damages . . . are designed to compensate Visto fairly and reasonably for its past injury . . . future damages may compensate Visto [only] for an *approximate* loss . . . ."[83] A royalty based on future sales is not "adequate in the sense that they are a suitable proxy for injunctive relief. What makes legal remedies inadequate under the circumstances of this case is the inability to calculate the plaintiff's future losses with precision. An injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement."[84] Thus, an injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement.

In *Smith & Nephew, Inc. v. Synthes (U.S.A.)*[85] the court issued a permanent injunction after finding infringement by two of Synthes' products used to treat orthopedic fractures. The court found that Smith & Nephew proved irreparable harm by showing flattening sales growth "attributable to a decreased ability to compete in the market",[86] significant sales of Synthes' infringing products,[87] competition between the two companies' products that inhibits the plaintiff's ability to develop customer relationships and new products, and loss of market share and brand recognition. The court held remedies at law were inadequate because of the inherent uncertainty in proving lost sales damages in a multiple-supplier market, because intangible damage to goodwill and brand

---

[80] 2006 WL 3741891 (Dec. 19, 2006).

[81] The court, however, stayed the injunction pending appeal because "Visto's attorneys violated the Protective Order in this case and then attempted to conceal those violations." *Id.* at 1.

[82] *Id.* at 4 (*citing Tivo* at 669).

[83] *Id.* at 4.

[84] *Id.*

[85] 466 F. Supp. 2d 978 (W.D. Tenn. 2006).

[86] *Id.* at 983.

[87] The court found no support for "Synthes' assertions that Smith & Nephew has not been irreparably harmed because of the limited competition between the primary Smith & Nephew product covered by the . . . [patents] and the infringing products made by Synthes." *Id.*

© 2007 by Bradley R. Larschan

recognition "can never be ascertained accurately," and because future damages would not adequately remedy against future infringement of the right to exclude.[88] The court held the balance of hardships favored an injunction because the only hardship Synthes showed was its inability to continue infringing. The court held the public interest in protecting patent rights favored an injunction because other sources of similar products exist, and because the court found no evidence of "undisputed and enormous public reliance on [the infringing] products."[89]

In *Sundance, Inc. v. DeMonte Fabricating Ltd.,*[90] the patentee relied on the harm to its non-exclusive licensees that directly competed with the infringer. The court denied the injunction and used the patentee's licenses as a basis for finding monetary damages were adequate compensation.

In *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.,*[91] the court found that the structure on the Development Driller rigs infringed the apparatus claims of Transocean's patents, that Transocean makes and markets deep water drill rigs equipped with the patented structure, that the customer base for deep water drill rigs is small and that GSF has not only used the Development Driller rigs equipped with the infringing structure to compete for the same customers and contracts as Transocean, but also to win contracts over competing bids from Transocean.

In finding the plaintiff would be irreparably harmed, the court observed that "[s]ince a patent grants the right to exclude others from practicing the invention, the right to exclude remains a relevant issue for courts to consider when weighing the equities for and against an application for permanent injunction."[92] Here, the parties competed for the same customers in the deepwater rig market. In a clear indication of its reasoning, the court noted that "GSF has not cited any case in which a continuing infringer in direct competition with a patent holder has not been permanently enjoined from using the patented invention to compete against the patent holder."[93]

The court found that the infringement was "not small components of those rigs but, instead, structures that are related to the rigs' core functionality."[94] The court went on to state that this was not a case where

---

[88] "The loss of market share and the resulting lost profits and loss of brand name recognition which Smith & Nephew suffered because of Synthes' continued sale of the infringing products constitute injuries that are both incalculable and irreparable." *Id.*

[89] *Id.* at 985.

[90] 2007 WL 37742 (E.D. Mich. Jan. 4, 2007).

[91] 2006 WL 3813778 (S.D.Tex. Dec. 27, 2006).

[92] *Id.* at 3.

[93] *Id.*

[94] *Id.* at 5.

© 2007 by Bradley R. Larschan

18

monetary damages would be sufficient to compensate Transocean for GSF's future infringement because that infringement relates only to a "small component" of the Development Driller rigs. Nor is the court persuaded that the mere fact that Transocean is willing to consider licensing its invention to GSF and others on "fair grounds" [ ] sufficient to defeat Transocean's request for a permanent injunction.[95]

In *MPT, Inc v. Marathon Labels, Inc.,*[96] the court found that the patented invention "has broad patent protection that reads directly upon" the infringing product.[97] In its analysis of the four-factor test, the court found that

monetary damages are not adequate to compensate for MPT's injury. Royalties will not stop the erosion of [plaintiff's] market. Another market entrant is likely to lead to a drop in prices, thus reducing MPT's royalties from Defendants and . . . profits. Allowing Marathon to sell the Smart Surface Placard in the United States market will also damage MPT in that all placards have previously been provided by MPT. This implicates a significant impact on MPT's commercial reputation.[98]

In granting a permanent injunction, the court found irreparable injury because the plaintiff had "established a strong market position and customer goodwill" and that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."[99]

In *Verizon Services Corp. v. Vonage Holdings Corp.,* the court granted a permanent injunction where Vonage was found to infringe seven Verizon patents at issue cover several technologies that are essential for successfully implementing a commercial Voice over Internet Protocol ("VoIP") telephone service. The patents were in three general categories: (1) two network patents (commercial scale VoIP telephony), (2) a public wireless/cordless handset patent and (3) four feature patents (*e.g.*, voicemail in VoIP).

---

[95] *Id.*

[96] 2007 WL 184747 (N.D. Ohio Jan. 19, 2007).

[97] *Id.* at 14.

[98] *Id.* at 15.

[99] *Id.* at 14, *quoting Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992).

© 2007 by Bradley R. Larschan

19

### 3. Reading the Tea Leaves

In the post-*eBay* cases in which an injunction has been sought after a finding of willful infringement, the injunction has been issued in at least 10 cases. Although the four-factor test weighs facts specific to each case, in every instance where the plaintiff had a directly competitive product or service to that which was found to willfully infringe, the courts have issued an injunction; conversely, if the plaintiff did not have a directly competitive product or service, no injunction was issued. In the only case in which a self-made inventor was the plaintiff, he inexplicably failed to cite this as a basis for seeking a permanent injunction.[100] Thus, the district courts appear to believe that *eBay* requires that a patent owner must make, use or sell a directly competitive product or service in order to be eligible for the grant of a permanent injunction. Whether and under what circumstances 'good' plaintiffs such as "university researchers and self-made inventors"[101] may be granted permanent injunctions has not yet been settled.

## V.    PUBLIC POLICY CONCERNS

In rejecting the time-tested balance of intellectual property rights, the *eBay* decision is likely to have significant, long-lasting unintended consequences.

As a threshold matter, in determining whether a plaintiff is eligible for a permanent injunction, the district courts must consider the *owner* of a patent rather than the *right the patent confers*. District courts must now ascertain whether the plaintiff is 'good' or 'bad', with the result that the latter are no longer eligible to be granted permanent injunctions whereas the former may be. A corollary of this is that a broad swath of plaintiffs' economic rights have been diminished — perhaps greatly — as a consequence of *eBay*. It is also likely that *eBay* will encourage willful infringement, since permanent injunctions will no longer issue unless, at a minimum, the patent owner is either (1) 'good' *or* (2) not 'bad' *and* makes, uses or sells a directly competitive product or service. Further, this broad swath of plaintiffs have lost their right to decide whether or not to license their property, or to whom to grant a license.[102] Finally, *eBay*

---

[100] *Voda*, 2006 WL 2570614 at 5. The court rejected the plaintiff's argument that "irreparable harm is presumed whenever validity and continuing infringement have been established" noting that it "runs afoul of the court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief." *Id.* Perhaps with *eBay* in mind, the court went on to note that "plaintiff identifies no harm to himself; rather, he relies on alleged harm to a non-party, Scimed." Perhaps critically to the case's outcome, this third party, who was the plaintiff's exclusive licensee, "elected not to sue to enforce the patent rights. As patents have 'the attributes of personal property', the person seeking a permanent injunction must demonstrate harm from infringement of those rights that is personal as well." *Id.*

[101] *eBay*, 126 Sup. Ct. at 1840.

[102] In this sense, patents have been carved out as a unique type of property. Consider, for example, the result if *eBay* were applied to real property. Instead of a willful trespasser being enjoined from further trespassing, the courts would limit a broad swath of land owners to money damages. In other words, the very notion of the exclusive use of real property would be substantially altered.

© 2007 by Bradley R. Larschan

20

will encourage many patent owners to consider bringing § 337 cases before the United States International Trade Commission instead of or in addition to initiating patent infringement actions in a U.S. District Court, further burdening litigants and causing societal inefficiencies.

### 'Good' and 'Bad' Plaintiffs

Prior to *eBay*, an owner whose patent rights were willfully infringed was generally entitled to a permanent injunction notwithstanding the availability of monetary damages. "[W]henever this court has had occasion to speak, it has decided that an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[103] This is because "[t]he heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."[104]

Over more than a century, the free market achieved an equilibrium balancing (however imperfectly) the rights of the plaintiff and a willfully infringing defendant. The defendant gained profits from intentionally infringing a patent. The plaintiff had the right to prevent others from using his invention during the life of the patent or to negotiate a license agreement with whomever he so desired under whatever terms he could negotiate. Because of the possibility of an injunction, the more (1) fundamental the patent was to the defendant's business and (2) willful an infringement, the more motivated the defendant was to enter into a license agreement.

As a means of thwarting so-called 'patent trolls' ('bad' plaintiffs), the *eBay* Court recast this balance. The "economic function of the patent holder"[105] must now be taken into account by the district court when considering whether a permanent injunction should issue; "some patent holders, such as university researchers or self-made inventors . . . may be able to satisfy the traditional four-factor test . . . ."[106] These are among the 'good' plaintiffs. But, lower courts, beware, "[a]n industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent."[107]

Here the Court is engaging in social engineering by changing the focus of legal analysis from a property right to drawing a distinction between 'good' and 'bad' property

---

[103] *Continental* at 425.

[104] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. at 135; 89 S.Ct. at 1583.

[105] 126 Sup. Ct. at 1842 (Kennedy, J. concurring).

[106] *Id.* at 1840.

[107] *Id.* at 1842 (Kennedy, J. concurring).

21

© 2007 by Bradley R. Larschan

right owners,[108] turning U.S. patent law on its head. Consider the case of the university researcher who is granted a patent and the patent is willfully infringed by Company A. The Court suggests that this patent owner may be eligible to obtain a permanent injunction. However, rather than endure the distraction and bear the expense of protracted patent litigation, our university researcher exclusively assigns (for 50% of the royalties) the patent to an individual whose sole interest is to enforce the patent right. This patent owner brings the suit the university researcher could not afford. This new patent owner is probably not eligible to obtain a permanent injunction. Before the district court renders a decision, this individual sells the patent to Company B, which makes a directly competitive product to Company A. Company B obtains a judgment for damages and seeks a permanent injunction, which is granted. Company C, which is a patent troll, then purchases the patent from Company B, whereupon Company A appeals the permanent injunction. Does the Federal Circuit vacate the injunction?

Where does *eBay* leave the typical inventor, whom the patent law is meant to encourage and protect in his innovation? The Court clearly views "self-made inventors" as 'good' patent owners who could be entitled to permanent injunctions if they elect to prevent others from infringing their property rights.[109] 'Self-made' inventors are, by definition,[110] financially successful. But is it because they have sufficient funds to bring a very costly patent infringement suit that they are eligible for a permanent injunction? What of the vast majority of inventors who (in this author's experience) typically deplete whatever financial resources they had available to perfect and patent an invention? By definition, this inventor is not 'self-made', nor is he capable of financing a patent infringement suit. If this inventor assigns his patent to a patent troll to enforce his rights, it appears under *eBay* the patent troll may no longer be eligible for an injunction.[111] Does *eBay* mean that "self-made inventors" like Alexander Graham Bell, Thomas Edison, Henry Ford and others are eligible for permanent injunctions because of their wealth, but

---

[108] Query whether the Court will seek to distinguish between families that own land to farm and land speculators or investors who own stock in a company and those who own derivatives? Where does the Court's analysis take us if district courts are to examine who owns a property right rather than what the property right confers?

[109] These "self-made inventors[ ] might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test . . .." 126 Sup. Ct. at 1840. *But cf. Voda* (where an apparently self-made inventor was denied a permanent injunction). As discussed previously, *eBay* and *Voda* can be reconciled because the plaintiff/inventor did not attempt to assert irreparable harm to himself but, rather, to his exclusive licensee; however, the licensee never asserted its claims to damages. *Voda*, 2006 WL 2570614 at 5. Nevertheless, the district court's reasoning does not appear to indicate the plaintiff/inventor would have prevailed had he pleaded personal irreparable injury.

[110] Self-made is defined as: "having achieved success or recognition by your own efforts; 'a self-made millionaire'". *WordNet® 2.1*, Princeton University (2005); "Having achieved success or recognition by one's own efforts: *a self-made millionaire.* THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

[111] What if the patent troll merely finances the inventors patent infringement suit in exchange for 99% of the inventor's recovery? Would the inventor be eligible for a permanent injunction?

© 2007 by Bradley R. Larschan

the great main stream of inventors – the nameless *hoi polloi* who are the majority of inventors – are not?

By focusing on the *owner* of the patent rather than the *right the patent confers* the Court has opened up Pandora's box.

## The Economic Rights of Most Patent Owners Have Been Diminished

The *eBay* decision has diminished the economic rights of many – perhaps most – patent owners.

In its attempt to thwart patent trolls,[112] the Court altered the balance of rights between a broad swath of patent owners and patent infringers. Absent a permanent injunction, a willful infringer now has little motivation to enter into a license agreement with a patent owner. The more fundamental the nature of the invention, the more core it is to the willful infringer's product and the greater profit the infringer derives from the invention, after *eBay* the less motivation it has to settle. After all, the infringer's damages are limited to a "reasonable royalty" (under *Georgia Pacific*[113]). Why would a defendant pay a reasonable royalty if its downside risk is to pay the same royalty after an adverse decision, exhaustion of appeals and the passage of several years (during which the infringer might wear down the plaintiff sufficiently to settle for less than a reasonable royalty)?[114]

A corollary of this is that *eBay* will embolden companies to infringe patent rights of the poor, most of the middle class,[115] 'bad' and non-competitor patent owners because permanent injunctions are likely not to issue. Willful infringers can readily assume that poor and many middle class patent owners do not possess the financial means to engage in very costly patent litigation and appeals. Heretofore, these patent owners could have assigned their patents to individuals or companies with the means to enforce their rights (including patent trolls); however, these individuals and companies are now 'bad' patent

---

[112] "An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent." 126 Sup. Ct. at 1842 (Roberts, J., concurring).

[113] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971) (setting forth 15 historical factors which have been repeatedly invoked in subsequent cases to determine "supposititious" licenses).

[114] In reality, a large company will look at the cost of litigation and conclude it is cheaper to pay $1-$2 million a year to keep a patent suit going rather than pay the reasonable royalty.

[115] These patent owners typically do not have the financial wherewithal to enforce their rights through litigation – which, by all accounts, is among the most expensive civil litigation brought in the courts today – because of the defendants' ability to increase costs and drag out the appeals process. In practice, the less financially able a patent owner, the more motivated the defendant is to exhaust its legal options.

© 2007 by Bradley R. Larschan

23

owners and no longer eligible for permanent injunctions. Thus, poor and many middle class patent owners are at an even greater disadvantage.

Additionally, non-competitor patent owners' "absolute property" is no longer absolute.[116] Formerly, the Court observed that "an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[117] Until *eBay*, the right to "exclusion may be said to [be] the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."[118] The Court does not attempt to reconcile *eBay* with *Continental's* holding that "the Constitution and patent laws intended to provide for an exclusive right to inventors to make, use, and vend their inventions."[119]

Similarly, this broad swath of patent owners appear to have lost their right to refuse to license a patent or to license a patent right selectively. Under *eBay*, a third party can simply infringe and pay a reasonable royalty despite the wishes of the patent owner.[120] This is starkly at odds with the Court's previous holding that "[t]he franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."[121] Indeed, prior to *eBay* the Court has consistently held that should "[a patentee] see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own . . . his title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it."[122] Not so after *eBay*.

---

[116] Compare, for example, the district courts' decisions in *Z4* (where monetary damages were sufficient to compensate for any future infringement) and *Visto* (where A royalty based on future sales is not "adequate in the sense that they are a suitable proxy for injunctive relief. What makes legal remedies inadequate under the circumstances of this case is the inability to calculate the plaintiff's future losses with precision. An injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement."). The principal distinction appears to be that in *Visto* the parties were direct competitors where they were not direct competitors in *Z4*.

[117] *Continental* at 425.

[118] *Id.*, citing *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540 (1902).

[119] *Id.* at 424.

[120] Unless, at a minimum, the patent owner is either (1) 'good' or (2) not 'bad' *and* makes, sells or uses a directly competitive product or service.

[121] *Bloomer v. McQuewan*, 14 How. at 549, 55 U.S. at 549 (Taney, C.J.).

[122] 210 U.S. at 425, quoting *Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. at 294-95.

© 2007 by Bradley R. Larschan

24

*Encouraging Trade Law Remedies As A Substitute for Enforcing the Patent Law in Federal Courts*

Section 337[123] has long been available for U.S. patent holders to prevent importation of infringing imports through exclusion orders.[124] It is an Article II proceeding administered by the ITC, initiated upon the filing of a complaint alleging unfair acts (such as patent infringement[125]). The ITC's final determinations are subject to Presidential review for policy reasons and ultimately can be appealed to the United States Court of Appeals for the Federal Circuit. Since *eBay*, there has been an increase in the number of §337 complaints brought before the United States International Trade Commission (ITC).[126]

Section 337 was enacted to protect U.S. domestic industries from unfair competition in the importation of goods made by foreign companies. Although the ITC does not award damages in § 337 cases, in some cases it is an attractive option because of the remedy of exclusion[127] and the relative swiftness of obtaining a decision.[128] On the other hand, a § 337 complaint is typically more detailed than district court actions and "is typically more expensive and requires a greater commitment of resources than the preparation of a district court complaint."[129]

---

[123] Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.

[124] For an overview of § 337, *see* Robert A. Caplen, *Recent Trends Underscoring International Trade Commission Review of Initial Determinations and Federal Circuit Appeals From Final Commission Determinations Under Section 337 of the Tariff Act of 1930*, 17 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 337 (2007).

[125] Over 90% of the cases brought under § 337 are based on alleged infringement of a U.S. patent.

[126] The number of § 337 patent-based proceedings as risen in recent Federal Government fiscal years: 2002 (11), 2003 (14), 2004 (22), 2005 (21) and 2006 (34). In the first five months of 2007, 14 proceedings were initiated.

[127] If the ITC finds that § 337 has been violated, two remedies are available. The first is an exclusion order barring infringing imports from entering the U.S. A limited exclusion order applies to goods manufactured, imported or sold by the respondents. A general exclusion order is also available and prevents any infringing articles from entering the U.S., regardless of origin. The exclusion orders are enforced by U.S. Customs and Border Protection, which has the power to inspect and deny entry of goods within the scope of the order. The second remedy is an order directing named respondents to "cease and desist from engaging in the unfair methods or acts involved."

[128] The ITC must conclude each investigation and make its determination "at the earliest practicable time." Moreover, the ITC rules of practice state that all investigations and related proceedings shall be conducted "expeditiously". To promote expeditious adjudication, § 337 directs the ITC to establish a target date for its final determination. ITC target dates are set shortly after publication of the *Federal Register* notice that the ITC has instituted a § 337 investigation. The typical target date is between 12 and 15 months. ITC target dates are rarely extended.

[129] William P. Atkins, *Appreciating 337 Actions at the ITC: A Primer on Intellectual Property Issues and Procedures at the U.S. International Trade Commission*, 5 U. BALT. INTELL. PROP. L.J. 103, 108 (1997).

25

© 2007 by Bradley R. Larschan

Section 337 cases are independent of patent infringement suits in the Federal courts; thus, they may run in parallel (although the litigation cost would almost double). One consequence of *eBay* is that patent owners are likely to resort to § 337 to restore a balance in negotiations with non-U.S. infringers of their intellectual property rights. *eBay* can be seen to discourage plaintiffs' resort to the Federal courts to adjudicate certain types of patent infringement disputes, and to heighten both litigation and societal costs in others.

It is difficult to see how the public interest is served by depriving litigants of the remedy of a permanent injunction when the remedy of an exclusion order is available through the ITC.

## VI.     CONCLUSION

The *eBay* decision has significantly altered the balance between willful infringers and a great many patent owners. In an effort to limit the rights of a class of patent owners (patent trolls), the Court has greatly limited the legal monopoly a patent grants. Now, only those patent owners who make or sell a directly competitive product are eligible for permanent injunctions. In so holding, the Court engaged in social engineering that is likely to have substantial unintended consequences for a broad swath of patent owners.

For more than a century the courts have consistently looked to the nature of the right a patent confers – that is, a legal monopoly with the right to exclude others – to determine whether or not a permanent injunction should issue, creating a presumption that an injunction should issue absent special circumstances. In a sweeping – and largely unreasoned – decision, the Court shifted the legal focus from the nature of the right to the nature of the patent owner. In so doing, the Court has implicitly overruled *Continental*, its predecessors (*Bloomer, E. Bement & Son*) and progeny, altering the balance of rights between patent owners and infringers to the material detriment of a broad swath of patent owners.

Henceforward, following a finding of willful infringement, to determine whether a permanent injunction should issue, *eBay* requires as a threshold matter that district courts examine whether a patent owner is 'good' or 'bad'. 'Bad' patent owners will no longer be eligible for permanent injunctions. 'Good' patent owners may be eligible for a permanent injunction, provided they make, use or sell a directly competitive product or service. Only then will courts apply the four-factor test. Although the Court appears to believe it straight forward to distinguish 'good' from 'bad' patent owners, the district courts have been and almost certainly will continue to struggle with shades of gray.

While the Court created the 'good'-'bad' distinction to thwart patent trolls, the unintended consequences are likely to be profound. To begin with, the balance of power has radically shifted in favor of willful infringers. Absent the possibility of an injunction, a willful infringer's downside is limited to paying a reasonable royalty. The more fundamental the invention and the greater profit generated from it, the more attractive it

© 2007 by Bradley R. Larschan

26

becomes to the infringer to prolong the litigation to wear down the plaintiff and settle for a less than reasonable royalty.

Next, *eBay* is likely to embolden companies to infringe patent rights of the poor, most of the middle class, 'bad' or non-competitor patent owners. Poor and middle-class patent owners (by definition, not "self-made inventors"[130]) typically cannot afford to enforce their patent rights, even though they might be eligible for a permanent injunction; if they assign their patents to individuals or companies to enforce their patents, they are now no longer eligible for a permanent injunction because the patent owner is 'bad' or a non-competitor.

*eBay* also eviscerates the monopoly – the very essence of the property right the patent confers. No longer is "the purpose of the patent ... to protect him in this monopoly."[131] 'Bad' patent owners have largely lost their historic absolute right to refuse to license a patent, or to license a patent right to companies of its choice. Under *eBay*, a third party can simply infringe and, at worst, pay a reasonable royalty despite the patent owner's wishes. Compulsory licensing has replaced monopoly.

Finally, *eBay* has encouraged patent owners no longer eligible for a permanent injunction to seek exclusion orders through § 337 proceedings before the ITC, substituting Article II for Article III actions. If the aggrieved patent owner wishes to recover monetary damages, he must still file a patent infringement suit in the district court, needlessly doubling his costs and imposing societal inefficiencies.

It is difficult to imagine that *eBay* will be the last word on the nature of U.S. patent rights.

---

[130] 126 Sup. Ct. 1840.

[131] *Continental* at 424.

© 2007 by Bradley R. Larschan

# Exhibit
# 2

From: Brad larschan [mailto:blarschan@comcast.net]
Sent: Friday, March 09, 2007 10:32 AM
To: jonathan_tunick@hotmail.com
Subject: RE: Follow Up to Meeting Yesterday

Jonathan,

This represents our understanding of the percentage split.

I look forward to hearing about John's conversation with Todd.

Thanks again to you and Peter for yesterday's meeting and a delicious lunch.

Brad

---

From: Jonathan Tunick [mailto:jonathan_tunick@hotmail.com]
Sent: Friday, March 09, 2007 10:21 AM
To: 'Brad larschan'
Subject: Follow Up to Meeting Yesterday

Brad-

I will report to you on John Hall's conversation with Todd Dickenson, but before doing so I want to ensure that we have agreement on our own working arrangement. As you and I agreed prior to our meeting, the waterfall splits will be 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming our prior understanding.

Best,

Jonathan

Jonathan L. Tunick
DigaComm, LLC
Principal
w: 312 222 0003
m: 415 828 3696
tunick@digacomm.com <mailto:tunick@digacomm.com>
im: jtunick2000

# Exhibit
# 3

**Subject: RE: Letter Agreement**
**Date: Friday, March 30, 2007 14:14**
**From: Jonathan Tunick <jonathan_tunick@hotmail.com>**
**Reply-To: <jonathan_tunick@hotmail.com>**
**To: 'Ray Bilbao' <rbilbao@reportonboard.com>**
**Cc: 'Bradley Larschan' <blarschan@reportonboard.com>, <smith@digacomm.com>**
**Conversation: Letter Agreement**

Ray-

One small change... I believe you inadvertently left out in the 4th paragraph to reference DigaComm or its designated assignee. Please make this change and we can fax over the final version for Brad's signature.

We are pleased to hear that Andrew is in accord of this basic understanding which gives us comfort to proceed.

Best,

Jonathan

---

**From:** Ray Bilbao [mailto:rbilbao@reportonboard.com]
**Sent:** Friday, March 30, 2007 11:21 AM
**To:** jonathan_tunick@hotmail.com
**Cc:** Bradley Larschan
**Subject:** Letter Agreement

Jonathan:

We have spoken with Andrew. He is okay in principle with the fees and has given approval for VIP to execute the Letter Agreement. I have attached your agreement which I revised to tighten it up a bit. Please review and if appropriate present to Peter for execution.

If you have any questions, please do not hesitate to contact me. I am stepping out for lunch and will be back shortly.

Sincerely,

J. Raymond Bilbao
Vice President & General Counsel
Vehicle Safety & Compliance, LLC

3150 Lenox Park Blvd, Suite 108
Memphis, TN 38115
(901) 546-7676 Telephone
(901) 546-7677 Facsimile

CONFIDENTIALITY NOTICE: This Electronic Mail, and any attachments thereto, is intended only for use by the addressee(s) named therein. The information contained in this e-mail, and any attachments thereto, is the confidential, proprietary information of Vehicle Safety and Compliance, LLC, its affiliates and/or subsidiaries (collectively, VSAC). If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and/or any attachments thereto, is strictly prohibited without the express written permission of VSAC. If you received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof

# Exhibit
# 4

DigaComm. L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003    fax 312/222-0008
www.digacomm.com

March 30, 2007

Mr. Bradley Larschan
Chief Executive Officer
Vehicle IP, LLC
3150 Lenox Park Blvd., Suite 108
Memphis, TN 38115

Re: Asset Purchase of VIP's Patents ("Letter")

Dear Brad:

This Letter confirms the understanding of DigaComm, L.L.C. ("DigaComm") with Vehicle IP, LLC ("VIP"), the holder of a portfolio of U.S. patents, foreign patents and foreign pending patent applications. DigaComm is providing assistance to VIP in negotiating an asset purchase agreement under which General Electric ("GE"), through a special purpose entity ("SPE"), would acquire the following patents (the "Contemplated Transaction") in VIP's patent portfolio (the "Assigned Patents") as described below herein:

1.  U.S. Patent No. 5,966,658 entitled "Automated Selection of a Communication Path"
2.  U.S. Patent No. 5,699,275 entitled "System and Method for Remote Patching of Operating Code Located in a Mobile Unit"
3.  U.S. Patent No. 5,983,108 entitled "Method and Apparatus for a Nationwide Cellular Telephone Network"
4.  U.S. Patent No. 6,018,657 entitled "System and Method for Communicating a Message Using a Cellular Telephone Network"
5.  U.S. Patent No. 6,148,202 entitled "Vehicle Locating and Communicating Method and Apparatus"
6.  Other VIP Patents to the extent GE requires (and VIP agrees) that any other patent from VIP's portfolio be included in the Contemplated Transaction

The Contemplated Transaction proposes that the GE-owned SPE would provide approximately $25 million to the SPE to enforce the Assigned Patents either through licensing and/or litigation, and that the SPE would distribute the proceeds recovered from enforcement of the Assigned Patents (the "Cash Waterfall Proceeds") as follows:

Initially, it has been proposed that the Cash Waterfall Proceeds would be utilized to: (a) reimburse the SPE for expenses advanced to fund the enforcement of the Assigned Patents (projected at $25 million); (b) repay certain loans (approximately $1.8 million) made to VIP by the Preferred Membership Interest Holders of Vehicle Safety and Compliance LLC ("VSAC Preferred Holders"), the sole member of VIP; and (c) allow the Preferred Holders to recoup their invested capital of approximately $3.1 million (the "Initial Distributions"). VIP and DigaComm acknowledge that the priority of payment of the Initial Distributions out of the Cash Waterfall Proceeds have not yet been agreed between GE and VIP. It is proposed that following the Initial Distributions, the SPE would retain 50% of Cash Waterfall Proceeds and distribute the remaining 50% of the Cash Waterfall Proceeds to VIP.

In the event that VIP and GE finally consummate the Contemplated Transaction on substantially the terms and conditions described above with such other commercially reasonable and customary terms

and conditions as may be negotiated between GE and VIP, VIP will instruct the SPE to distribute directly to DigaComm or its designated assignee such portions of VIP's 50% of the Cash Waterfall Proceeds as set forth in the Distribution Schedule attached hereto as **Exhibit A**.

DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.

VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

In the unlikely event any dispute should arise between us relating to this Letter such may only be resolved by a single arbitrator in accordance with the commercial arbitration rules of the American Arbitration Association in Wilmington, Delaware with the internal laws of that State applying. Injunctive relief, should such be required, may be obtained in any Court of competent jurisdiction.

This Letter contains the entire understanding between DigaComm and VIP with respect to this subject matter. In the event that GE and VIP fail to finally consummate the Contemplated Transaction, this Agreement shall be null and void.

We have enjoyed the working relationship we have developed with VIP and are confident that our efforts will be productive.

Sincerely,

Peter W. Smith
Managing Member

PWS/glb

Confirmed and Agreed
Signature

Bradley Lanahan, Chief Executive Officer

Date   March 30, 2007

## Exhibit A

| Tier | Cash Waterfall Amount | Percentage of Cash Waterfall Distributed to DigaComm | Dollar Amount of Percentage of Cash Waterfall Distributed to DigaComm |
|---|---|---|---|
| Tier 1 | $300,000,000 | 5.00% | $15,000,000 |
| Tier 2 (Additional) | $200,000,000 | 4.00% | $8,000,000 |
| Tier 3 (Additional) | $250,000,000 | 3.50% | $8,750,000 |
| Tier 4 (Additional) | $250,000,000 | 2.50% | $6,250,000 |
| Tier 5 (Additional) | $500,000,000 | 2.00% | $10,000,000 |
| Tier 6 (Additional) | $500,000,000 | 1.50% | $7,500,000 |
| Tier 7 (Additional) | $500,000,000 | 1.00% | $5,000,000 |

*Exhibit A above has been retyped for clarity.

# Exhibit

# 5

**Subject: Digacomm Agreement with VIP**
**Date: Thursday, June 14, 2007 15:48**
**From:** Peter Smith <smith@digacomm.com>
**To:** John Hall <john.b.hall@ge.com>
**Cc:** Brad Larschan <blarschan@comcast.net>
**Conversation: Digacomm Agreement with VIP**

John,

Enclosed please find the documents as promised.  Best,
Peter

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003   fax 312/222-0008
www.digacomm.com

June 13, 2007

Mr. John B. Hall
Senior Vice President, Technology Group
GE Commercial Finance
500 West Monroe
Chicago, Illinois 60661

RE: DigaComm Agreement with Vehicle IP, LLC

Dear John,

Following our conversation with you this morning, I am sending you a copy of DigaComm LLC ("DigaComm") executed agreement with Vehicle IP, LLC ("VIP").

I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us.

All of us associated with the VIP opportunity greatly appreciate your lead role in initiating the highly productive collaborative working relationship which has evolved between your GE colleagues and Brad's team.

With best wishes.

Sincerely yours,

Peter W. Smith
Managing Member

Cc: Brad Larscham, CEO
     Vehicle IP, LLC

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003   fax 312/222-0008
www.digacomm.com

March 30, 2007

Mr. Bradley Larschan
Chief Executive Officer
Vehicle IP, LLC
3150 Lenox Park Blvd., Suite 108
Memphis, TN 38115

Re:   Asset Purchase of VIP's Patents ("Letter")

Dear Brad:

This Letter confirms the understanding of DigaComm, L.L.C. ("DigaComm") with Vehicle IP,
LLC ("VIP"), the holder of a portfolio of U.S. patents, foreign patents and foreign pending patent
applications.  DigaComm is providing assistance to VIP in negotiating an asset purchase agreement under
which General Electric ("GE"), through a special purpose entity ("SPE"), would acquire the following
patents (the "Contemplated Transaction") in VIP's patent portfolio (the "Assigned Patents") as described
below herein:

1.   U.S. Patent No. 5,966,658 entitled "Automated Selection of a Communication Path"
2.   U.S. Patent No. 5,699,275 entitled "System and Method for Remote Patching of Operating Code
     Located in a Mobile Unit"
3.   U.S. Patent No. 5,983,108 entitled "Method and Apparatus for a Nationwide Cellular Telephone
     Network"
4.   U.S. Patent No. 6,018,657 entitled "System and Method for Communicating a Message Using a
     Cellular Telephone Network"
5.   U.S. Patent No. 6,148,202 entitled "Vehicle Locating and Communicating Method and
     Apparatus"
6.   Other VIP Patents to the extent GE requires (and VIP agrees) that any other patent from VIP's
     portfolio be included in the Contemplated Transaction

The Contemplated Transaction proposes that the GE-owned SPE would provide approximately
$25 million to the SPE to enforce the Assigned Patents either through licensing and/or litigation, and that
the SPE would distribute the proceeds recovered from enforcement of the Assigned Patents (the "Cash
Waterfall Proceeds") as follows:

Initially, it has been proposed that the Cash Waterfall Proceeds would be utilized to: (a) reimburse
the SPE for expenses advanced to fund the enforcement of the Assigned Patents (projected at $25 million);
(b) repay certain loans (approximately $1.8 million) made to VIP by the Preferred Membership Interest
Holders of Vehicle Safety and Compliance LLC ("VSAC Preferred Holders"), the sole member of VIP;
and (c) allow the Preferred Holders to recoup their invested capital of approximately $3.1 million (the
"Initial Distributions").  VIP and DigaComm acknowledge that the priority of payment of the Initial
Distributions out of the Cash Waterfall Proceeds have not yet been agreed between GE and VIP.  It is
proposed that following the Initial Distributions, the SPE would retain 50% of Cash Waterfall Proceeds and
distribute the remaining 50% of the Cash Waterfall Proceeds to VIP.

In the event that VIP and GE finally consummate the Contemplated Transaction on substantially
the terms and conditions described above with such other commercially reasonable and customary terms

and conditions as may be negotiated between GE and VIP, VIP will instruct the SPE to distribute directly to DigaComm or its designated assignee such portions of VIP's 50% of the Cash Waterfall Proceeds as set forth in the Distribution Schedule attached hereto as **Exhibit A**.

DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.

VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

In the unlikely event any dispute should arise between us relating to this Letter such may only be resolved by a single arbitrator in accordance with the commercial arbitration rules of the American Arbitration Association in Wilmington, Delaware with the internal laws of that State applying. Injunctive relief, should such be required, may be obtained in any Court of competent jurisdiction.

This Letter contains the entire understanding between DigaComm and VIP with respect to this subject matter. In the event that GE and VIP fail to finally consummate the Contemplated Transaction, this Agreement shall be null and void.

We have enjoyed the working relationship we have developed with VIP and are confident that our efforts will be productive.

Sincerely,

Peter W. Smith
Managing Member

PWS/glb

Confirmed and Agreed
Signature

Bradley Larschan, Chief Executive Officer

Date    March 30, 2007

## Exhibit A

| Tier | Cash Waterfall Amount | Percentage of Cash Waterfall Distributed to DigaComm | Dollar Amount of Percentage of Cash Waterfall Distributed to DigaComm |
|---|---|---|---|
| Tier 1 | $300,000,000 | 5.00% | $15,000,000 |
| Tier 2 (Additional) | $200,000,000 | 4.00% | $8,000,000 |
| Tier 3 (Additional) | $250,000,000 | 3.50% | $8,750,000 |
| Tier 4 (Additional) | $250,000,000 | 2.50% | $6,250,000 |
| Tier 5 (Additional) | $500,000,000 | 2.00% | $10,000,000 |
| Tier 6 (Additional) | $500,000,000 | 1.50% | $7,500,000 |
| Tier 7 (Additional) | $500,000,000 | 1.00% | $5,000,000 |

*Exhibit A above has been retyped for clarity.

# Exhibit
# 6

# VEHICLE IP, LLC

5101 WHEELIS DRIVE, SUITE 100
MEMPHIS, TN 38117
(901) 546-7676 TELEPHONE
(901) 546-7677 FACSIMILE

September 7, 2007

**VIA OVERNIGHT EXPRESS**

Mr. Peter W. Smith
Managing Member
DigaComm L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611

RE:    **Letter Agreement between Vehicle IP, LLC ("VIP") and DigaComm L.L.C. ("DigaComm") dated March 30, 2007 (the "Letter Agreement")**

Dear Peter:

As you are aware, the above-referenced Letter Agreement, as per its terms and conditions, was made expressly contingent upon approval by a majority of the holders of the Preferred Interests of VIP's sole member, Vehicle Safety & Compliance, LLC ("VSAC"). On August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee. At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein.

Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein. Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

If you have any questions, please do not hesitate to contact me to discuss.

Sincerely,

Bradley Larschan
Chief Executive Officer

cc:    J. Raymond Bilbao, Esq.
Andrew Seamons
Lee Piovarcy, Esq.

# EXHIBIT B



| | | To | "Matt Nirider" <mnirider@kirkland.com> |
|---|---|---|---|
| "Lee, John" <jlee@freebornpeters.com> 03/19/2008 09:43 AM | | cc | "Fabian, Kellye L." <kfabian@freebornpeters.com>, "Fogel, Joe" <jfogel@freebornpeters.com> |
| | | bcc | |
| | | Subject | Subpoenas to Morgan Keegan entities |

History:    🖅 This message has been forwarded.

Matt,

As we discussed, we have been retained by the Morgan Keegan entities with respect to the third-party subpoenas. Thank you for your agreement to provide us with fourteen additional days within which to respond to the subpoenas along the lines of the letter sent to you by Kellye Fabian regarding the other third-parties.

Additionally, at this point, we do not anticipate that we will be able to proceed with the depositions of the Morgan Keegan entities on the dates set forth in the deposition subpoenas. We will get back to you shortly with alternative dates.

Thank you for your consideration.  --John

**John Z. Lee**
**Freeborn & Peters LLP**
**311 South Wacker Drive, Suite 3000**
**Chicago, IL 60606**
**(312) 360-6738**
**(312) 360-6574 (fax)**

**Confidentiality Notice:** This email and its attachments (if any) contain confidential information of the sender which is legally privileged. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. We do not waive attorney-client or work product privilege by the transmission of this email. If you have received this email in error, please immediately notify the sender at  jlee@freebornpeters.com and permanently delete any copies of this email (digital or paper) in your possession.

Although we have taken steps to ensure that this email and its attachments (if any) are free from any virus, the recipient should, in keeping with good computing practice, also check this email and any attachments for the presence of viruses. This message and any attachments hereto cannot be used for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code.

**Freeborn & Peters LLP**
http://www.freebornpeters.com

# EXHIBIT C



"Fabian, Kellye L."
<kfabian@freebornpeters.co
m>

03/24/2008 01:51 PM

To  "Matt Nirider" <mnirider@kirkland.com>

cc  "Stephen Hackney" <shackney@kirkland.com>, "Lee, John"
<jlee@freebornpeters.com>, "Fogel, Joe"
<jfogel@freebornpeters.com>

bcc

Subject  RE: Dep dates

History:        This message has been replied to and forwarded.

Matt,

Lee Piovarcy is available beginning at 10:00 a.m. for his deposition and a 30(b)(6) deposition of Rivertide
on April 22nd.  Woody Welch is available April 23rd also beginning at 10:00 a.m.  These gentlemen will be
available at Mr. Piovarcy's law office, Martin, Tate, Morrow & Marston, 6410 Poplar Ave., Suite 1000,
Memphis, TN.  Please confirm that these dates work for you.  I will get back to you regarding the Morgan
Keegan funds.

Thanks.

Kellye

**From:** Matt Nirider [mailto:mnirider@kirkland.com]
**Sent:** Thursday, March 20, 2008 5:24 PM
**To:** Lee, John
**Cc:** Fabian, Kellye L.; Stephen Hackney
**Subject:** Dep dates


John,

We are still waiting to hear from you on dep dates for Welch, Piovarcy, and the Morgan Keegan funds.

Matt


Matthew E. Nirider
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

ph. (312) 469-7110
fax (312) 660-0255


----- Forwarded by Matt Nirider/Chicago/Kirkland-Ellis on 03/20/2008 04:51 PM -----
"Fabian, Kellye L." <kfabian@freebornpeters.com>

                                                                To  <mnirider@kirkland.com>
03/19/2008 05:08 PM                                             cc
                                                                Subject

Matt,

I got your voicemail. I'm on vacation, but John Lee will be attempting to get depsition dates for Welch and Piovarcy tomorrow. Thanks.

Kellye

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT D



"Fabian, Kellye L."
<kfabian@freebornpeters.co
m>

03/25/2008 02:25 PM

To "Matt Nirider" <mnirider@kirkland.com>

cc "Fogel, Joe" <jfogel@freebornpeters.com>, "Lee, John"
<jlee@freebornpeters.com>, "Stephen Hackney"
<shackney@kirkland.com>

bcc

Subject RE: Dep dates

Thanks, Matt. I'm talking to Morgan Keegan tomorrow and will try to get a date for them at the same time
for convenience. Thanks.

**From:** Matt Nirider [mailto:mnirider@kirkland.com]
**Sent:** Tuesday, March 25, 2008 1:49 PM
**To:** Fabian, Kellye L.
**Cc:** Fogel, Joe; Lee, John; Stephen Hackney
**Subject:** RE: Dep dates


Kellye,

The dates, times, and locations for Mr. Welch and Mr. Piovarcy work fine for us. I will send you revised
notices reflecting the new dates and locations. Since we will already be down in Memphis, could we try to
do the Morgan Keegan funds that week also?


Matt


Matthew E. Nirider
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

ph. (312) 469-7110
fax (312) 660-0255




"Fabian, Kellye L."
<kfabian@freebornpeters.com>

03/24/2008 01:51 PM

To "Matt Nirider" <mnirider@kirkland.com>

cc "Stephen Hackney" <shackney@kirkland.com>, "Lee, John"
<jlee@freebornpeters.com>, "Fogel, Joe" <jfogel@freebornpeters.com>

Subject RE: Dep dates



Matt,

Lee Piovarcy is available beginning at 10:00 a.m. for his deposition and a 30(b)(6) deposition of Rivertide

on April 22nd.  Woody Welch is available April 23rd also beginning at 10:00 a.m.  These gentlemen will be available at Mr. Piovarcy's law office, Martin, Tate, Morrow & Marston, 6410 Poplar Ave., Suite 1000, Memphis, TN.  Please confirm that these dates work for you.  I will get back to you regarding the Morgan Keegan funds.

Thanks.

Kellye

**From:** Matt Nirider [mailto:mnirider@kirkland.com]
**Sent:** Thursday, March 20, 2008 5:24 PM
**To:** Lee, John
**Cc:** Fabian, Kellye L.; Stephen Hackney
**Subject:** Dep dates

John,

We are still waiting to hear from you on dep dates for Welch, Piovarcy, and the Morgan Keegan funds.

Matt

Matthew E. Nirider
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

ph. (312) 469-7110
fax (312) 660-0255

----- Forwarded by Matt Nirider/Chicago/Kirkland-Ellis on 03/20/2008 04:51 PM -----
"Fabian, Kellye L." <kfabian@freebornpeters.com>

03/19/2008 05:08 PM

To <mnirider@kirkland.com>
cc
Subject

Matt,
I got your voicemail. I'm on vacation, but John Lee will be attempting to get depsition dates for Welch and Piovarcy tomorrow. Thanks.

Kellye
**********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may

constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************

************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************

# EXHIBIT E

**Freeborn & Peters LLP**

April 1, 2008

<u>VIA E-MAIL AND U.S. MAIL</u>

Matthew E. Nirider
Kirkland & Ellis LLP
200 East Randolph Dr.
Chicago, IL 60601

*Attorneys at Law*

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
Tel 312.360.6000

Kellye L. Fabian
Partner
Direct 312.360.6417
Fax 312.360.6572
kfabian@
freebornpeters.com

*Chicago*

*Springfield*

      *Re:*    ***DigaComm Litigation***
             Third-Party Subpoenas to Morgan Keegan Funds

Dear Matt:

I am writing concerning the subpoenas issued by you and directed to the Morgan Keegan Employee Investment Fund, LP and the Morgan Keegan Early Stage Fund, LP (collectively the "Morgan Keegan Funds").

I have spoken with representatives of the Morgan Keegan Funds who have informed me that no representative from the Funds attended the relevant board or preferred interest holder meetings and they have no information or knowledge related to the those meetings or the vote at issue in this litigation. Therefore, and in the interest of conserving time and resources in this matter, I propose that the Morgan Keegan Funds offer an affidavit in lieu of deposition testimony. We are happy to work with you as to the substance of such an affidavit. Alternatively, the Morgan Keegan Funds would be willing to respond to Interrogatories in lieu of depositions, or at least prior to scheduling depositions so as to allow you and your client an opportunity to determine whether the depositions are necessary.

Please let me know whether you are amenable to either of these suggestions or if you have any alternatives for consideration. If you are not willing to take alternate steps in lieu of immediately scheduling the depositions, please let me know so that I may work to coordinate scheduling. Thank you.

Very truly yours,

*Kellye L. Fabian*

Kellye L. Fabian

**Freeborn & Peters LLP**

Matthew E. Nirider
April 1, 2008
Page 2


cc:    Steve Hackney

KLF/reaa


1518035v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-78 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Vehicle Safety & Compliance, LLC, | ) | |
| Pittco Capital Partners, L.P., | ) | |
| Pittco Capital Partners II, L.P., | ) | |
| Andrew Seamons, J.R. "Pitt" Hyde, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I, James E. O'Neill, hereby certify that on the 17th day of April, 2008, I caused a

copy of the following documents to be served on served on the individuals on the attached

service lists in the manner indicated

**OPPOSITION TO MOTION FOR PROTECTIVE ORDER TO QUASH THE
SUBPOENAS ISSUED TO MORGAN KEEGAN EMPLOYEE INVESTMENT FUND, LP
AND MORGAN KEEGAN EARLY STAGE FUND, LP**

_____
James E. O'Neill (Bar No. 4042)

Digacomm Service List for Opposition
Motion for Protective Order
#136822

**By Electronic Mail and Overnight Mail**
Joseph L. Fogel
John Z. Lee
Kellye L. Fabian
Freeborn & Peters LLP
311 S. Wacker Dr., Suite 3000
Chicago, IL 60606

**By Electronic Mail and Hand Delivery**
Robert K. Beste III
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, Suite 1000
P.O. Box 410
Wilmington, DE  19899